# UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT

August Term, 2002

(Argued: April 15, 2003                          Initially Decided: August 6, 2003
(Remanded by Supreme Court:: June 14, 2004
(Re-Submitted: September 10, 2004)               Decided: November 23, 2005
                                                 Errata Filed: January 6, 2006)

Docket Nos. 02-9361, 02-3087

DORIT WHITEMAN, ALFONS SPERBER, HERTHA FIELD, ALICE JAY SUSSMAN, ANITTA LEA, ROBERT WEINBERGER, RUDOLF AUSPITZ, MAX URI, FRITZ URI, LEO GRANIERER, SOPHIE HABER, GERTRUDE FIALA, HARRIET MEHL-ROTTENBERG, GERDA FELDSBERG, ALEXANDER-SANDOR FÜRST, ERNST B. RIVIN-RIESENFELD, LIZZY RAPPBAUER, RUTH DAVIDOVITS, DOROTHEA WINKLER, ERICH RICHARD FINSCHES, MICHAEL SCHWARZ, HEINZ BISCHITZ, LOTTIE MECZESSCHWENK, LUGE SVOBODA, FRIEDERIKE HERZL, ROBERT KLEIN,

*Plaintiffs-Appellees,*

v.

DOROTHEUM GMBH & CO KG, also known as Dorotheum Auktions-Versatz-Und Bankgesellschaft MBH, REPUBLIC OF AUSTRIA, ÖSTERREICHISCHE INDUSTRIEHOLDING AG,

*Defendants-Appellants,*

VOEST-ALPINE STAHL AG, VA TECHNOLOGIE AG, BÖHLER UDDEHOLM AG, ÖMV AG, RAIFFEISEN ZENTRAL ÖSTERREICHISCHE BANK A.G., STEY-DAIMLER-PUCH AG, also known as Stey Daimler-Puch Spezialfahrzeug AG, also known as Stey Daimler Puch Fahrzeug Technik AG, UNIQA VERSICHERUNGEN AG, AUSTRIAN DOE CORPORATIONS 1 TO 100, ERSTE BANK DER OESTERREICHISCHEN SPARKASSEN AG,

*Defendants.*

_____

In re REPUBLIC OF AUSTRIA, DOROTHEUM GMBH & CO KG, and ÖSTERREICHISCHE INDUSTRIEHOLDING AG,

    *Petitioners.*

_____

DORIT WHITEMAN, ALFONS SPERBER, HERTHA FIELD, ALICE JAY SUSSMAN, ANITTA LEA, ROBERT WEINBERGER, RUDOLF AUSPITZ, MAX URI, FRITZ URI, LEO GRANIERER, SOPHIE HABER, GERTRUDE FIALA, HARRIET MEHL-ROTTENBERG, GERDA FELDSBERG, ALEXANDER-SANDOR FÜRST, ERNST B. RIVIN-RIESENFELD, LIZZY RAPPBAUER, RUTH DAVIDOVITS, DOROTHEA WINKLER, ERICH RICHARD FINSCHES, MICHAEL SCHWARZ, HEINZ BISCHITZ, LOTTIE MECZESSCHWENK, LUGE SVOBODA, FRIEDERIKE HERZL, ROBERT KLEIN,

    *Plaintiffs-Respondents,*

   v.

REPUBLIC OF AUSTRIA, DOROTHEUM GMBH & CO KG, ÖSTERREICHISCHE INDUSTRIEHOLDING AG,

    *Defendants-Petitioners,*

VOEST-ALPINE STAHL AG, VA TECHNOLOGIE AG, BÖHLER UDDEHOLM AG, ÖMV AG, RAIFFEISEN ZENTRAL ÖSTERREICHISCHE BANK A.G., STEY-DAIMLER-PUCH AG, also known as Steyr Daimler-Puch Spezialfahrzeug AG, also known as Steyr Daimler Puch Fahrzeug Technik AG, UNIQA VERSICHERUNGEN AG, AUSTRIAN DOE CORPORATIONS 1 TO 100, MAGNA STEY, ERSTE BANK DER OESTERREICHISCHEN SPARKASSEN AG, & DAVID H. PIKUS,

    *Defendants.*

Before: KEARSE, CABRANES and STRAUB, *Circuit Judges.*

  Before us are (1) an interlocutory appeal by the Republic of Austria, challenging a discovery order of the United States District Court for the Southern District of New York (Shirley Wohl Kram, *Judge*), aimed at determining whether plaintiffs can establish subject-matter jurisdiction (No. 02-9361), and (2) Austria's petition for a writ of mandamus to compel the District Court to rule on

defendants' pending motion to dismiss (No. 02-3087). We are asked by the Republic of Austria—and by the United States and the American Council for Equal Compensation of Nazi Victims from Austria, as *amici curiae*—to dismiss this case, which is reported to be the sole remaining obstacle to the implementation of a fund to compensate Austrian Jewish victims of the Nazi regime for Holocaust-related property deprivations.

VACATED in part, DISMISSED in part, and REMANDED in part. Judge Straub dissents in a separate opinion.

GREGORY S. COLEMAN (Christian J. Ward, Konrad L. Cailteux, Nina Nagler*, of counsel*), Weil, Gotshal & Manges LLP, New York, NY, *appearing on behalf of Defendants-Appellants and Petitioners Republic of Austria and Osterreichische Industrieholding AG.*

William M. Barron, Alston & Bird LLP, New York, NY, *appearing on behalf of Defendant-Appellant and Petitioner Dorotheum GmbH & Co KG.*

Jay R. Fialkoff (Philippe Zimmerman, Jayson D. Glassman, *of counsel*), Moses & Singer LLP, New York, NY, *appearing on behalf of Plaintiffs-Appellees Whiteman, et al.*

BERNARD W. NUSSBAUM, Wachtell, Lipton, Rosen & Katz, New York, NY*, appearing on behalf of United States District Judge Shirley Wohl Kram.*

CHARLES G. MOERDLER (James A. Shifren, Joseph E. Strauss, Jeremy S. Rosof, *of counsel*), Stroock & Stroock & Lavan LLP, New York, NY, *appearing on behalf of Amicus Curiae the Austrian Jewish Community.*

DOUGLAS HALLWARD-DRIEMEIER (William H. Taft IV, Jonathan B. Schwartz, Wynne M. Teel, Robert D. McCallum, Gregory G. Katsas, Jr., Mark B. Stern, *of counsel*), Department of Justice, Washington, D.C., *appearing on behalf of Amicus Curiae United States of America in support of Defendant-Appellant Republic of Austria.*

Stanley M. Chesley (Jean M. Geoppinger, *of counsel*), Waite, Schneider, Bayless & Chesley Co., L.P.A., Cincinnati, OH, *appearing on behalf of Amicus Curiae American Council for Equal Compensation of Nazi Victims from Austria.*

3

JOSÉ A. CABRANES, *Circuit Judge*:

We are asked by the Republic of Austria—and by the United States and the American Council for Equal Compensation of Nazi Victims from Austria, as *amici curiae*—to dismiss this case, which is reported to be the sole remaining obstacle to the implementation of a fund to compensate Austrian Jewish victims of the Nazi regime for Holocaust-related property deprivations. That fund was created in 2001 pursuant to an executive agreement between the United States and Austria.

This putative class action against Austria, certain of its instrumentalities (collectively, "Austria"), and other Austrian entities arises from sweeping confiscations of property that were part of the systematic Nazi victimization of Austrian Jews between 1938 and 1945. The severity of property expropriations by the Nazi regime cannot be overstated. We are reminded of the words of Judah Gribetz, the court-appointed Special Master in a separate Holocaust reparations case: "[T]here is scarcely a victim of the Nazis who was not looted, and on nearly an incomprehensible scale." *In re Holocaust Victim Assets Litig.*, 302 F. Supp. 2d 89, 95 (E.D.N.Y. 2004) (internal quotation marks omitted).

Before us are (1) an interlocutory appeal by Austria, challenging a discovery order of the United States District Court for the Southern District of New York (Shirley Wohl Kram, *Judge*), aimed at determining whether plaintiffs can establish subject-matter jurisdiction (No. 02-9361), and (2) Austria's petition for a writ of mandamus to compel the District Court to rule on defendants' pending motion to dismiss (No. 02-3087). This is the second time that this case comes before us. *See Garb v. Republic of Poland*, 72 Fed. Appx. 850 (2d Cir. 2003) (summary order). We consider it anew following a remand from the Supreme Court. *See Republic of Austria v. Whiteman*, 124 S. Ct. 2835 (2004). In the time between our 2003 disposition of these matters and the Supreme Court's remand, the Court resolved the question of the retroactivity of the Foreign Sovereign Immunities

4

Act of 1976 ("FSIA"), 28 U.S.C. §§ 1330, 1602-11, in the affirmative, but reserved the question of how much deference should be accorded to views of the Executive Branch in asserting jurisdiction over a foreign sovereign, *see Republic of Austria v. Altmann*, 541 U.S. 677 (2004).

We consider the latter question today. The past two presidential administrations, notwithstanding their differences in political affiliation, have committed the United States to a policy of resolving Holocaust-era restitution claims through international agreements rather than litigation. Consistent with that policy, the United States has engaged in extensive international negotiations culminating in a 2001 executive agreement with Austria to establish a fund to compensate Austrian Jews (and their heirs and successors) whose property was confiscated during the Nazi era and the Second World War. Distributions from the Austrian compensation fund remain, however, contingent on the dismissal of this case. Accordingly, the United States has submitted a Statement of Interest urging dismissal.

In light of the Supreme Court's political question jurisprudence, as well as its recent rulings directing "case-specific deference" to the expressed foreign policy interests of the United States, *Sosa v. Alvarez-Machain*, 124 S. Ct. 2739, 2766 n.21 (2004); *see also Altmann*, 541 U.S. at 702, we hold that deference to a statement of foreign policy interests of the United States urging dismissal of claims against a foreign sovereign is appropriate where, as here, (1) the Executive Branch has exercised its authority to enter into executive agreements respecting the resolution of those claims; (2) the United States Government (a) has established through an executive agreement an alternative international forum for considering the claims in question, and (b) has indicated that, as a matter of foreign policy, the alternative forum is superior to litigation; and (3) the United States foreign policy advanced by the executive agreement is substantially undermined by the continuing pendency of the claims. Mindful of the Supreme Court's recent emphasis (albeit in a different legal context) on

5

preserving the "'capacity of the President to speak for the Nation with one voice in dealing with other governments' to resolve claims . . . arising out of World War II," *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 424 (2003) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381 (2000)), we dismiss plaintiffs' claims against Austria in deference to the stated foreign policy interests of the United States.

## BACKGROUND

Plaintiffs are present and former nationals of Austria, and their heirs and successors, who seek compensation for the taking of their property in that country during the Nazi Era and the Second World War.

### I.      District Court Proceedings

Plaintiffs comprise a class of "present and former citizens and residents of Austria of Jewish descent [and their heirs and beneficiaries] who . . . were victims of Nazi persecution [and] whose assets were converted and human rights were barbarously violated" from 1938 to 1945. Compl. ¶ 2.[1] They filed suit on October 20, 2000 in the United States District Court for the Southern District of New York, bringing claims against the Republic of Austria and a number of its instrumentalities, including Dorotheum GmbH (an auction house owned and controlled by the Republic of Austria that Whiteman alleges recently sold property that was expropriated from Austrian Jews during the class period, *see id.* ¶¶ 31, 100-02) and Österreichische Industrieholding AG (an instrumentality through which the Republic of Austria has owned, operated, and controlled commercial enterprises, *see id.* ¶ 88). Plaintiffs' claims are based principally on Austria's "looting, expropriation,

---

[1] References to the "Complaint" are to the first amended complaint dated August 24, 2001. Although the complaint was again amended on November 11, 2002, this second amendment occurred after defendants-appellants filed a Notice of Appeal, thereby conferring jurisdiction on this Court to review portions of the District Court's June 5, 2002 and October 9, 2002 orders.

6

Aryanization, and/or liquidation," *id.* ¶ 98, of the property interests of "any Jewish Austrian or former Austrian person," *id.* ¶ 95.

Because plaintiffs sought to hold Austria liable in courts of the United States, and because, under the FSIA, "a foreign state is presumptively immune from the jurisdiction of United States courts[,] unless a specified [statutory] exception applies," *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993),[2] plaintiffs asserted that three exceptions to the FSIA apply to their claims—namely, (1) "waiver," pursuant to 28 U.S.C. § 1605(a)(1),[3] Compl. ¶ 44; (2) "commercial activity," pursuant to 28 U.S.C. § 1605(a)(2),[4] *id.*; and (3) "takings," pursuant to 28 U.S.C. § 1605(a)(3),[5] *id.*

---

[2] *See also* 28 U.S.C. § 1604 ("[A] foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."); *Kato v. Ishihara*, 360 F.3d 106, 107-08 (2d Cir. 2004) (describing the FSIA as codifying a "restrictive theory of sovereign immunity, under which foreign sovereigns . . . enjoy immunity from suit in United States courts, subject to a few, enumerated statutory exceptions" (internal quotation marks, footnote, and citations omitted)).

[3] 28 U.S.C. § 1605(a)(1) provides that

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . (1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver[.]

[4] 28 U.S.C. § 1605(a)(2) provides that

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]

[5] 28 U.S.C. § 1605(a)(3) provides that

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . (3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States[.]

7

Austria moved for dismissal on sovereign immunity grounds, arguing that the exceptions to sovereign immunity embodied in the FSIA should not be applied retroactively to conduct that predates that statute's enactment in 1976. In an order dated June 5, 2002, the District Court declined to rule on Austria's motion to dismiss and instead ordered the parties to engage in limited discovery to settle, primarily, issues of subject-matter jurisdiction. *Whiteman v. Fed. Republic of Austria*, No. 00 Civ. 8006 (SWK), slip op. at 5 (S.D.N.Y. June 5, 2002). Austria appealed that interlocutory discovery order to this Court, No. 02-9361, and filed a petition for a writ of mandamus to compel the District Court to rule on the pending motion to dismiss, No. 02-3087.

We consolidated these actions with the appeal in *Garb v. Republic of Poland* (No. 02-7844) for oral argument.[6] *See Garb*, 72 Fed. Appx. at 853.

## II. This Court's August 6, 2003 Summary Order

We heard this appeal on April 15, 2003, and, in light of a supervening and controlling decision by another panel of our Court in *Abrams v. Société Nationale Des Chemins De Fer Francais*, 332 F.3d 173 (2d Cir. 2003), we entered a summary order on August 6, 2003, (1) vacating the District Court's June 5, 2002 discovery order; and (2) denying Austria's petition for a writ of mandamus to compel the District Court to decide the pending motion to dismiss, *see Garb*, 72 Fed. Appx. at 855.

Relying on *Abrams*, we stated that this case "raise[d] the threshold questions whether and on what terms the federal courts have jurisdiction under the [FSIA] to adjudicate the liability of sovereign states for conduct occurring prior to the statute's enactment [in 1976]." *Id.* at 853. We explained, bound as we then were by *Abrams*, that whether the FSIA could be retroactively applied depended upon whether doing so would have an "impermissible 'retroactive effect'—that is, whether applying the FSIA would 'impair rights a party possessed when he acted, increase a party's

---

[6] The *Garb* case will be decided in a separate opinion by this Court.

8

liability for past conduct, or impose new duties with respect to transactions already completed."' *Id.* (quoting *Abrams*, 332 F.3d at 180-81).

As required by *Abrams*, we remanded this case to the District Court to determine "the Department of State's policy prior to [the enactment of the] FSIA with respect to sovereign immunity for . . . Austria in the circumstances presented in" this case. *Id.* at 854.

Austria then moved for a stay of the issuance of our mandate pending its petition to the Supreme Court for a writ of certiorari; we granted this motion on September 10, 2003.

On June 14, 2004, the Supreme Court granted Austria's petition for writ of certiorari, vacated our judgment, and remanded this case to us "for further consideration in light of *Republic of Austria v. Altmann*, 541 U.S. [677], 124 S. Ct. 2240 [] (2004)." *Republic of Austria v. Whiteman*, 124 S. Ct. 2835 (2004).

### III.     Participation of the United States Government

Since the Supreme Court's remand, the parties and various *amici curiae*, including the United States, have filed supplemental letter briefs with this Court with respect to a post-*Altmann* disposition of this appeal. The United States, as *amicus curiae*, has filed a letter brief, supplementing a Statement of Interest it submitted to the District Court, and restating its view that there are no principles of international law that proscribe or regulate the taking by States of the property of their own nationals. *See* Letter of Gregory G. Katsas, Deputy Assistant Attorney General, Department of Justice, and William H. Taft, IV, The Legal Adviser, Department of State, at 8-12 (Sept. 9, 2004) ("United States Supplemental Letter").[7] The United States also participated "to inform the Court of

---

[7] We note that both the United States Statement of Interest and the United States Supplemental Letter were submitted jointly by the United States Department of Justice and the Department of State, thus representing the considered views of both Departments—indeed, of the Executive Branch of the Government—that "the foreign policy interests of the United States support dismissal of plaintiffs' claims." United States Supplemental Letter, at 1.

9

its *foreign policy interests* with regard to claims for restitution or compensation by Holocaust survivors and other victims of the Nazi era," *id.* at 2 (emphasis added), and urged us to dismiss this case in deference to these interests. *See id.* at 1, 3-8.

Underscoring that "[n]o price can be put on the suffering that these victims endured[,]" and concluding that "the moral imperative remains to provide some measure of justice and to do so in the victims' remaining lifetimes[,]" the United States asserted its foreign policy interest that "matters of Holocaust-era restitution and compensation . . . be resolved through negotiation and cooperation, rather than subjecting victims and their families to the prolonged uncertainty and delay of litigation." *Id.* at 2. Accordingly, the United States has informed the Court that

> [i]n January 2001, after facilitating multilateral negotiations involving governments, companies, and victims' representatives, the United States and Austria concluded an executive agreement that led to the creation of the General Settlement Fund ["GSF"], a fund to be capitalized with $210 million plus interest to make payments to Austrian victims of Nazi-era persecutions. Approximately 20,000 claims have already been submitted to the GSF, but full funding of the GSF awaits dismissal of *this litigation. . . .*
>
> . . .
>
> [I]t is in the foreign policy interests of the United States for this action to be dismissed on any valid legal ground. The United States and Austria have entered into an executive agreement, which led to the establishment of [the GSF] to make payments to certain victims of the Nazi era whose property was confiscated, including members of the proposed plaintiff class. It would be in the interests of the United States for the GSF to be the exclusive remedy for all such claims, and our foreign policy interests favor an all-embracing and enduring legal peace for Austria and Austrian companies with respect to claims such as plaintiffs'. *Payments under the GSF will not begin until all prior litigation pending in United States courts has been dismissed. This is the final case remaining. The continued pendency of plaintiffs' claims thus impedes the success of this important foreign policy initiative, and threatens the foreign policy interests of the United States.*

United States Supplemental Letter, at 2, 6 (emphases added) (citation omitted).

a.      *Negotiations and International Agreements Leading to the Creation of the General Settlement Fund*

The expressed views of the United States must be understood against the backdrop of over fifty years of diplomatic negotiations with the government of Austria regarding the settlement of Nazi-era claims.  In Article 26 of the State Treaty for the Re-Establishment of an Independent and Democratic Austria ("Austrian State Treaty")—a multilateral treaty ratified by the President of the United States on June 24, 1955 and that entered into force on July 27, 1955—Austria agreed to provide restitution for property that it had confiscated "on account of the racial origin or religion of the owner" during the Holocaust and Second World War.  *See* State Treaty for the Re-Establishment of an Independent and Democratic Austria, May 15, 1955, art. 26, 6 U.S.T. 2369, 2435-36.  Soon thereafter, in 1958, the United States agreed that it "would no longer intervene diplomatically on behalf of claimants under Article 26" if Austria acted to settle victims' claims in good faith.  *See* IX *Foreign Relations of the United States, 1958-1960*, at 769-70 (Glenn W. LaFantasie ed., 1993).  This understanding was then memorialized in a May 1959 exchange of diplomatic notes, which constituted an executive agreement between the United States and Austria that entered into force on May 22, 1959.[8]  *See* Settlement of Certain Claims Under Article 26 of the Austrian State Treaty, 10.2 U.S.T. 1158.

In February 2000, partly in response to class action litigation in United States courts, negotiations involving the government of Austria and attorneys representing Holocaust victims commenced under the active leadership of the United States Government.  *See* Declaration of Stuart E. Eizenstat, Deputy Secretary of the Treasury and Special Representative of the President and Secretary of State on Holocaust Issues ¶ 5 (Jan. 19, 2001) ("Eizenstat Declaration") (text reproduced

---

[8] Plaintiffs allege that "Austria has failed and refused to live up to its State Treaty obligations to effectuate restoration, or even the alternative Treaty obligation of recompense where restoration is impossible."  Compl. ¶ 21.

at Supp. App. at 1039-54 and in United States Department of State, *Digest of United States Practice in International Law for 2001*, *available at* http://www.state.gov/documents/organization/16561.pdf.) Over the next nine months, negotiations focused principally "on a proposed initiative to establish a fund to make payments to victims of slave and forced labor (and certain others) during World War II and the Nazi era." *Id.*

According to Deputy Secretary of the Treasury Stuart E. Eizenstat, the co-chair of these negotiations, "[t]he parties . . . anticipated that at the conclusion of an agreement concerning the establishment of a fund for Nazi-era forced and slave laborers who worked on the territory of the present-day Republic of Austria, the parties would commence negotiations concerning the establishment of a similar fund for those who suffered from aryanization, theft, or destruction of property on the territory of the present-day Republic of Austria during this same time period." *Id.* ¶ 6. Indeed, "as a pre-condition . . . to concluding an agreement concerning forced and slave labor claims . . . , Austria committed $150 million to cover certain property claims." *Id.* ¶ 7.

On October 24, 2000, as the parties to the negotiations signed a Joint Statement expressing their support for the Austrian "Reconciliation Fund" as the exclusive remedy for all Nazi-era forced and slave labor claims against Austria, the governments of the United States and Austria entered into an executive agreement. Agreement Between the Austrian Federal Government and the Government of the United States of America Concerning the Austrian Fund "Reconciliation, Peace and Cooperation," Oct. 24, 2000, 40 I.L.M. 523 (2001) ("Reconciliation Fund Agreement"). In the Reconciliation Fund Agreement, "Austria committed that the operation of the Reconciliation Fund would be governed by principles agreed [to] by the parties to the negotiations, and the United States committed to take certain steps to assist Austria and Austrian companies in achieving 'legal peace' in the United States with respect to forced and slave labor claims arising out of the Nazi era and World

12

War II (and any other claims covered by the Reconciliation Fund)." Eizenstat Declaration ¶ 8. Moreover, the United States undertook to "take appropriate steps to oppose any challenge to the sovereign immunity of Austria with respect to . . . *other* claims arising out of the National Socialist era or World War II for which Austria and the United States agree that a suitable potential remedy has been provided." Reconciliation Fund Agreement, 40 I.L.M. at 525 (emphasis added). The Reconciliation Fund Agreement entered into force by exchange of diplomatic notes on December 1, 2000, in the final months of the administration of President William J. Clinton. *See* Eizenstat Declaration ¶ 8.

In October 2000, negotiations also commenced concerning the creation of the General Settlement Fund ("GSF") "to address all property/aryanization claims against Austria and/or Austrian companies arising out of the Nazi era and World War II, and all other Nazi-era claims against Austria and/or Austrian companies not covered by the Reconciliation Fund." *Id.* ¶ 9. Again co-chaired by Eizenstat, these negotiations "included the United States, the Austrian Federal Government, Austrian companies, and the representatives of the victims including the Conference on Jewish Material Claims, a non-governmental organization created to negotiate for and administer compensation for Nazi crimes to Jewish people around the world."[9] *Id.* The United States also confirms that, "throughout the negotiations, attorneys representing the victims vigorously represented not only the named plaintiffs, but also the interests of heirs and others who are similarly situated." *Id.* ¶ 28; Statement of Interest of the United States of America, *Whiteman v. Federal Republic*

---

[9] The Conference on Jewish Material Claims ("CJMC") is an umbrella organization whose member organizations include the American Gathering/Federation of Jewish Holocaust Survivors, the American Jewish Committee, the American Jewish Congress, B'nai B'rith International, the Centre of Organizations of Holocaust Survivors in Israel, and the World Jewish Congress. *See* Eizenstat Declaration, at 4 n.2. For more information about the CJMC, including its mission and a complete list of member organizations, see *Claims Conference: The Conference on Jewish Material Claims Against Germany, 2003 Annual Report with 2004 Highlights* 1, 74 (2004), and the CJMC's Website, http://www.claimscon.org/ (last visited July 21, 2005).

13

*of Austria*, No. 00-8006 (SWK), at 14 (S.D.N.Y. Oct. 12, 2001) ("United States Statement of Interest").

These negotiations came to fruition on January 17, 2001, when "the parties to the negotiations gathered in Washington to sign a Joint Statement concluding the negotiations, and expressing their support for the GSF as the exclusive remedy for all claims arising against Austria and/or Austrian companies arising out of or relating to the [Nazi] Era or World War II," with certain exceptions not relevant here.[10] Eizenstat Declaration ¶ 13. An agreement among the parties became effective on January 23, 2001, at the beginning of the administration of President George W. Bush, "when the United States and Austria exchanged diplomatic notes expressing Austria's commitment that the operation of the GSF will be governed by principles the parties agreed upon during the negotiations, . . . and the United States' commitment to take certain steps to assist Austria . . . in achieving 'legal peace.'" United States Statement of Interest, at 6. The agreement embodied in this exchange of notes, Joint Statement and Exchange of Notes Between the United States and Austria Concerning the Establishment of the General Settlement Fund for Nazi-Era and World War II Claims, 40 I.L.M. 565 (Jan. 17, 2001) ("GSF Agreement"), is an executive agreement between the Governments of the United States and Austria, United States Statement of Interest, at 6 n.4.

On June 6, 2001, the government of Austria adopted legislation creating the GSF. *Id.* at 6. On the same day, "the Austrian Federal Government provided the United States Government with a diplomatic note stipulating that Austria had fulfilled the obligations necessary to bring into force" the GSF agreement. *Id.* at 7.

---

[10] Specifically, it was agreed that GSF not be the exclusive remedy for claims for *in rem* restitution of works of art and claims covered by the Reconciliation Fund. *See* Eizenstat Declaration ¶ 10. It should be assumed throughout this opinion that these two categories of claims are excluded from any general references to "all claims" against Austria arising out of or relating to the Nazi Era or World War II.

14

*b.*     *The GSF as a Remedy for Nazi-Era Property/"Aryanization" Claims*

Austria's GSF legislation establishes an independent three-member Claims Committee to consider Nazi-era claims against Austria, with the United States and Austria each selecting one committee member, who would jointly appoint a chairperson. *See* United States Statement of Interest, at 8-9; *see also* GSF Agreement, Annex A ¶ 2.a, 40 I.L.M. at 571. The claims committee is required "to establish simplified procedures" and to use "relaxed standards of proof." United States Statement of Interest, at 9; *see also* GSF Agreement, Annex A ¶ 2.c, 40 I.L.M. at 571. One half of GSF funds will be allocated through a "claims-based" process on a pro-rata basis, and the other half through an "equity-based" process on a per-household basis. Eizenstat Declaration ¶ 19; *see also* GSF Agreement, Annex A ¶ 2.f-h, 40 I.L.M. at 572-73.

In addition, pursuant to the GSF Agreement, the government of Austria has "enacted legislation establishing, funding, and authorizing a three-member Arbitration Panel . . . to consider, on a case-by-case basis, the *in rem* return of publicly-owned property, including property formerly owned by Jewish communal organizations." United States Statement of Interest, at 11; *see also* GSF Agreement, Annex A ¶ 3, 40 I.L.M. at 574-76. Austria also "amended certain pension and social benefit laws to assist victims of National Socialism." United States Statement of Interest, at 12; *see also* GSF Agreement, Annex A ¶ 4, 40 I.L.M. at 576-77.

In its Statement of Interest, the United States particularly underscores that "*all* victims with Nazi-era claims against Austria and/or Austrian companies . . . are eligible to submit claims to the GSF." United States Statement of Interest, at 13 (emphasis in original). Upon considering the age of Holocaust survivors, the level of GSF funding, the allocation of GSF funds, and the GSF's eligibility criteria, the United States represents to us that "the results of the negotiations as embodied in the GSF are fair under all the circumstances." *Id.* at 20; *see also id.* at 20-22. Indeed, the position

15

of the United States is that the GSF Agreement "represent[s] a definitive statement of U.S. foreign policy that the GSF provides the best mechanism for resolving claims such as plaintiffs', by assuring broad coverage of victims and broad participation by companies, which could not be possible through judicial proceedings, and providing as expeditious as possible a mechanism for making fair and speedy payments to now elderly victims." United States Supplemental Letter, at 8 (citations and internal quotations marks omitted).

     *c.      United States Foreign Policy Interests in the GSF*

The United States further represents to us that it is in its "foreign policy interests . . . for the GSF to be the exclusive forum and remedy for the resolution of all claims against Austria . . . arising out of or relating to the National Socialist Era or World War II," and that "the United States Government believes that all [such claims] should be pursued through the GSF instead of the courts." United States Statement of Interest, at 15. According to the United States, its interests in the implementation of the GSF are five-fold.

First, the United States invokes its "important policy objective . . . to bring some measure of justice to Holocaust survivors and other victims of the Nazi era, who are elderly and are dying at an accelerated rate, in their lifetimes." *Id.* "[T]he United States believes the best way to accomplish this goal is through negotiation and cooperation," and it represents to us that the GSF "is an excellent example of how such cooperation can lead to a positive result." *Id.* Therefore, it is the view of the United States that the GSF "will provide benefits to more victims, and will do so faster and with less uncertainty than would litigation."[11] *Id.* at 15-16. Indeed, "the United States hopes [that the GSF]

---

[11] The United States Statement of Interest is echoed by *amicus curiae* American Council for Equal Compensation of Nazi Victims From Austria ("ACOA"), which describes itself as "the single organization representing Holocaust survivors from Austria in America," and whose "sole mission" for the past thirty-nine years "has been to secure equal compensation of *all* Nazi victims from Austria," Br. of *Amicus Curiae* Am. Council for Equal Compensation of Nazi Victims from Austria at 4. The ACOA urges us to dismiss this action in order to secure to Holocaust victims the

will serve as an example to other nations and in other cases where resolution of claims by victims of the Nazi era for restitution and compensation has not yet been achieved." *Id.* at 17.

Second, it is the position of the United States that the establishment of the GSF

> will strengthen the ties between the United States and . . . Austria. . . . Since 1945, the United States has sought to work with Austria to address the consequences of the Nazi era and World War II through political and governmental acts, beginning with the first compensation and restitution laws in post-war Austria that were passed during the Allied occupation. In recent years, Austrian-American cooperation on these and other issues has continued, and the joint effort to develop the Reconciliation Fund and the GSF has helped solidify the close relationship between the two countries.

*Id.* (internal citations omitted). In this light, the United States has emphasized the role of Austria in "the prosperity of Europe"—particularly Austria's efforts to "promot[e] democracy" and the "economic development of Central and Eastern Europe," as well as its support for the "integration of the European Union." *Id.* at 17-18. The United States has informed us that "continued cooperation with Austria"—which, it asserts, is being advanced by the GSF—"is important to helping achieve these United States interests." *Id.* at 18.

Third, the United States highlights that "the GSF helps further the United States' interest in maintaining good relations with Israel and with Western, Central, and Eastern European nations, from which many of those who suffered during the Nazi era and World War II come." *Id.*

Fourth, the United States anticipates that the alternative to the GSF—"years of litigation whose outcome would be uncertain at best, and which would last beyond the expected life span of the large majority of survivors," *id.*—"could lead to conflict among survivors' organizations and among survivors and Austria and Austrian industry, conflicts into which the United States

---

payments now available to them from the GSF as a result of the diplomatic negotiations undertaken on their behalf by the United States—payments that are being withheld pending the termination of this action.

17

Government would inevitably be drawn," *id.* at 18-19. The Government further warns that such conflict would likely include "threats of political action, boycotts, and legal steps against corporations from Austria"—events that would "set[ ] back Austrian-American economic cooperation." *Id.* at 19.

> Finally, the United States informs us that the GSF
>
>> is a fulfillment of a half-century effort to complete the task of bringing a measure of justice to victims of the Nazi era. It is in the foreign policy interests of the United States to take steps to address the consequences of the Nazi era, to learn the lessons of, and teach the world about, this dark chapter in European history and to seek to ensure that it never happens again.

*Id.* (internal quotation marks omitted). Although the United States acknowledges that "no amount of money will ever be enough to make up for Nazi-era atrocities," it underscores that the GSF would make substantial additional funds and other avenues of relief available. *Id.* at 19-20.

Under the GSF Agreement, a "precondition to allowing the GSF to make payments to victims" is the "dismissal of all pending Nazi-era property/aryanization claims against Austria and/or Austrian companies (as well as any other claim covered by the GSF)." *Id.* at 19; *see also* GSF Agreement, Annex C, 40 I.L.M. at 579-80. The United States informs us that plaintiffs' suit—this litigation—is the only pending claim standing in the way of the GSF's implementation. *See* United States Supplemental Letter, at 6. Because the continued pendency of this lawsuit "impedes the success of [an] important foreign policy initiative, and threatens the foreign policy interests of the United States," the Government urges us to dismiss it. *Id.*[12]

---

[12] Our dissenting colleague suggests that we should remand once more "for a determination of whether circumstances permit and warrant discretionary deference to the executive foreign policy interests stated here." Dissent, at [42 n.28]. Quite apart from the considerable risk that any further delay would impose upon elderly victims currently awaiting compensation, the dissent's recommendation would, in effect, encourage a federal district court to second-guess the United States Government's foreign policy determination that—for a host of reasons, *see* United States Statement of Interest, at 15-20, including, *inter alia*, the importance of preserving relations with allied nations—the United States

## I. The Effect of *Altmann*

On remand, we must first determine how *Altmann* informs our disposition of this case. In *Altmann*, the Supreme Court departed from what it termed a pre-existing "antiretroactivity presumption," 541 U.S. at 696, and held that the FSIA, including its exceptions, is applicable to conduct that preceded its enactment. The Court explained that because the doctrine of foreign sovereign immunity "reflects current political realities and relationships," *id.*, courts have traditionally "resolved questions of foreign sovereign immunity by deferring to the decisions of the political branches," *id.* (internal quotation marks omitted). The Court identified the FSIA as "the most recent such decision" and, "absent contraindications," held that courts should defer to it—that is, apply it retroactively—rather than "presume" it inapplicable "merely because it postdates the conduct in question." *Id.*

Yet the *Altmann* Court "emphasiz[ed] the narrowness of [its] holding," attributable in part to the particular posture assumed by the Executive Branch in that case. *Id.* at 700-02. The Court underscored that the United States Government had chosen *not* to submit a statement of its foreign policy interests implicated by the exercise of jurisdiction in *Altmann*. *Id.* at 701-02 & n.22. The Court then advised that in future cases, "should the State Department choose to express its opinion on the implications of exercising jurisdiction over *particular* petitioners in connection with *their* alleged conduct, that opinion might well be entitled to deference as the considered judgment of the

---

should honor its commitment to the GSF as the mechanism for resolving this class of Nazi-era claims and to terminate this litigation "on any valid legal ground," United States Supplemental Letter, at 6. Because we decide, pursuant to the political question doctrine and related jurisprudence concerning deference to the Executive in matters of foreign policy, that such questions are nonjusticiable, we decline our colleague's invitation to prolong this litigation further by a remand of dubious purpose.

Executive on a particular question of foreign policy." *Id.* at 702 (footnote omitted). Since no such State Department opinion was expressed in *Altmann*, the Court declined to explicate further the circumstances under which it would be appropriate for a federal court to defer to a statement of foreign policy interests of the United States in deciding whether to assert jurisdiction over a foreign sovereign *in a particular case*.

A few weeks after its *Altmann* decision, the Court again urged "case-specific deference to the political branches" in *Sosa*, 124 S. Ct. at 2766 n.21. Relying on *Altmann*, the *Sosa* Court stated (albeit in dicta) that when the United States Government submits statements of interest to federal courts, "there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy." *Id.* The Court again did not specify how much weight we should give to statements of United States foreign policy interests, or under what circumstances.

**II.      Deference to the United States Statement of Interest**

Unlike *Altmann*, this case has elicited a statement of interest in which the United States invoked "its foreign policy interests" to urge the dismissal of plaintiffs' claims. When the Government first presented its statement of interest to the District Court, it did not urge that Court to rest on the foreign policy interests of the United States as "an independent legal basis for dismissal." United States Statement of Interest, at 20. In the wake of *Altmann*, however, the United States no longer offers this qualification and instead asserts that deference to "the views of the Executive on this nation's foreign policy interests in determining whether to exercise jurisdiction in a particular case" supports the dismissal of plaintiffs' claims. United States Supplemental Letter, at 1; *see also id.* at 4-8. We are, therefore, squarely faced with the issue reserved in *Altmann* and *Sosa*—when, and to what extent, should the stated foreign policy interests of the United States be

20

accorded deference.[13]  In the circumstances presented in this case, we hold that deference is appropriate.

Judicial deference to the Executive Branch on questions of foreign policy has long been established under the prudential justiciability doctrine known as the "political question" doctrine, which we apply here.  *See, e.g., Baker v. Carr*, 369 U.S. 186, 211 (1962) ("Not only does resolution of [foreign relations] issues frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature; but many such questions uniquely demand single-voiced statement of the Government's views." (footnotes omitted)).  Yet the Supreme Court has warned that

> it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance. Our cases in this field seem invariably to show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action.

*Id.* at 211-12.

We, too, have emphasized that

> [n]ot every case "touching foreign relations" is nonjusticiable and judges should not reflexively invoke these doctrines to avoid difficult and somewhat sensitive decisions in the context of human rights. We believe a preferable approach is to weigh carefully the relevant considerations on a case-by-case basis.

*Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995) (internal citations omitted); *see also Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione*, 937 F.2d 44, 49 (2d Cir. 1991) ("[T]he doctrine is one of political questions, not one of political cases." (internal quotation marks omitted)).

---

[13] While we readily acknowledge that the Supreme Court has not yet had occasion to reach a holding identical to that of the case at bar, we nonetheless conclude, in light of the Court's recent pronouncements and for the reasons elaborated below (1) that deference to the Executive is appropriate in certain cases and (2) that the case at bar is one such case.

In pursuing a "case-by-case" inquiry under the political question doctrine, we have consistently employed one or more of the "six independent tests" identified by the Supreme Court in *Baker v. Carr*:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or
>
> [2] a lack of judicially discoverable and manageable standards for resolving it; or
>
> [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or
>
> [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or
>
> [5] an unusual need for unquestioning adherence to a political decision already made; or
>
> [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Vieth v. Jubelirer*, 541 U.S. 267, 277-78 (2004) (quoting *Baker*, 369 U.S. at 217); *see also Hwang Geum Joo v. Japan*, 413 F.3d 45, 48 (D.C. Cir. 2005) (applying the six *Baker v. Carr* tests before dismissing a FSIA claim on grounds of nonjusticiability under the political question doctrine); *Kadic*, 70 F.3d at 249 (relying on the six *Baker v. Carr* tests in a foreign relations context); *Can v. United States*, 14 F.3d 160, 163 (2d Cir. 1994) (same).

Our inquiry into the proper deference to be accorded to the United States Statement of Interest is guided by our application of the political question doctrine because this doctrine "reflect[s] the judiciary's concerns regarding separation of powers," *Kadic*, 70 F.3d at 249.[14]  Our

---

[14] Our dissenting colleague argues that by addressing the question of justiciability in light of the Supreme Court's pronouncements regarding the appropriate scope of judicial deference to the Executive in the conduct of foreign relations, we "conflat[e]" two distinct strands of law, thereby "set[ting] a dangerous precedent."  Dissent, at [42].  Rather

resolution of this case under the political question doctrine is greatly reinforced by the historic deference due to the Executive in the conduct of the foreign relations of the United States, as highlighted by the Supreme Court's recent guidance in *Altmann* and *Sosa*. *See also Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983) (recognizing the historic deference accorded to "decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities").[15] We further note that our decisions and those of other courts considering the application of the political question doctrine have properly relied on the views of the United States Government, as expressed in its statements of interest.[16] *See, e.g.*, *Kadic*, 70 F.3d at 250; *see also Hwang Geum Joo*, 413 F.3d at 48

---

than analyzing the broad language of *Baker* in a vacuum, however, it is appropriate that our political question analysis be informed by the well-established principles concerning the need for deference to the Executive Branch—one of the "coordinate branches of government" that is "due respect" within the *Baker* framework.

[15] Nothing in this opinion should be understood to indicate that the District Court may not dismiss plaintiffs' claims against parties that are *not* foreign sovereigns or instrumentalities of foreign sovereigns (and thus are not appellants here) under the "political question" doctrine.

[16] We note that, in *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227 (11th Cir. 2004), the Eleventh Circuit recently declined to dismiss a Holocaust-related claim against German banks on the basis of the "political question" doctrine, instead dismissing the claim on the grounds of international comity. In so holding, the court relied principally on a statement in the Agreement Concerning the Foundation "Remembrance, Responsibility and the Future," July 17, 2000, U.S.-F.R.G., Annex B, ¶ 7, 39 I.L.M. 1298, 1304, that "[t]he United States does not suggest that its policy interests concerning the Foundation in themselves provide an independent legal basis for dismissal" of the claims covered by the agreement. From this language, the *Ungaro-Benages* court concluded that the Executive has "purposely chosen not to settle" the claims and therefore signaled that pursuit of the claims in United States courts would not "interfere with American foreign relations." 379 F.3d at 1235-37.

Although the precise language that the Eleventh Circuit found significant in *Ungaro-Benages* also appears in the executive agreements between the United States and Austria, we respectfully disagree with the Eleventh Circuit's view that such a provision renders the "political question" doctrine inapplicable. It is true that the United States carefully declined to "suggest" *in its agreements with Austria* that its statements of interest would necessarily lead to the dismissal of all relevant litigation. Given the complexity of the issues at stake, this was an understandable and prudent clarification by the United States' diplomatic representatives in a communication with a foreign State regarding the possible actions of the independent American judiciary under then-prevailing domestic United States law.

But in declining to *guarantee* to Austria that courts would defer to its statements of interest, the United States surely did not express intent to *waive* the right to such deference. The United States never indicated that its foreign policy interests should not, as a matter of law, lead to the dismissal of a claim covered by its executive agreements. Furthermore, the United States never stated that it would not *seek* and, in its post-*Altmann* submission does indeed seek, dismissal on the basis of its foreign policy interests. *See* United States Supplemental Letter, at 1. That the United States

23

(deferring to the foreign policy views of the Executive Branch, as expressed "in a thorough and persuasive Statement of Interest").

We need not examine each of the six *Baker* tests in turn, for it is clear that this case meets the fourth test; in other words, "a court's undertaking independent resolution" of *this claim* is impossible "without expressing lack of the respect due" the Executive Branch.[17]  To begin with, the foreign

---

did not represent to Austria that its statements of interest would be accorded deference in every relevant judicial forum does not preclude us from according deference to the views of the United States *in this case.*

Our dissenting colleague asserts that by dismissing this litigation, we will, in effect, grant by judicial fiat that which Austria did not succeed in obtaining during the course of its negotiations with the United States Government. In the view of the dissent, this asserted undue benefit to Austria would do "more than what was anticipated in the agreement" and thereby "undermine[ ] the political balance clearly struck" by the Clinton Administration  Dissent, at [37]. We disagree for several reasons. First, the mere fact that, in the view of the dissent, the United States "*could have* guaranteed dismissal of domestic claims against Austria," Dissent, at [36], has no bearing on whether, at this juncture, it would be disruptive to United States foreign policy interests for this litigation to proceed; indeed, the United States' international commitment to seek dismissal "on any valid legal ground" is entirely consistent with its view, then and now, that this litigation is harmful to U.S. foreign policy interests. Second, even if, *arguendo*, at the time of entering negotiations with Austria, the United States Department of State was not concerned about the precise ramifications of this litigation, intervening developments in foreign policy would provide an additional basis upon which the Executive Branch could now seek dismissal of this litigation. Third, representations by the United States in the course of diplomatic negotiations with the Austrian government were made against the backdrop of a legal landscape different from that which now prevails; to suggest that the United States is somehow precluded from seeking dismissal of this litigation because of its negotiating position with the Austrians would effectively subordinate the principles animating the political question doctrine to the undefined need to preserve the presumed "political balance" struck by a prior presidential administration in our country's negotiations with a foreign state. (It is worth noting that, whereas our dissenting colleague reconstructs the United States' negotiating strategy from a published memoir of a high-ranking Clinton administration official, our findings with respect to the foreign policy interests of the United States are drawn strictly from the formal litigation position asserted in this Court by the Executive Branch, including a sworn declaration, submitted in support of dismissal of these claims "in the enduring and high interest of the United States to vindicate [the GSF]," Eizenstat Declaration ¶ 38, by the very official on whose informal recollection our dissenting colleague relies.)

[17] In applying this fourth *Baker* test, courts have been particularly attentive to the views of the United States Government about the consequences of proceeding with litigation.  *See Kadic*, 70 F.3d at 250 (stating that the views of the Executive are entitled to "respectful consideration" in applying the fourth through sixth *Baker* tests, although these views "would not necessarily preclude adjudication"); *see also Alperin v. Vatican Bank*, 410 F.3d 532, 556-57 (9th Cir. 2005) (noting "the Executive Branch's continuing silence on the Holocaust Survivors' claims," but stating that "[h]ad the State Department expressed a view, that fact would certainly weigh in evaluating this fourth *Baker* formulation").

Our decision here to rely principally on the fourth *Baker* test should not be taken to imply that we agree with our dissenting colleague's conclusion that "Whiteman's complaint clearly would survive the other *Baker* tests." *See* Dissent, at [31]. Moreover, the mere fact that the Supreme Court has indicated recently (and quite tentatively) that the *Baker* tests "are probably listed in descending order of both importance and certainty" provides no indication at all that the latter tests have somehow been repealed or are no longer proper grounds for application of the political question doctrine. *See Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004); *see also Alperin*, 410 F.3d at 546 (focusing on first two *Baker* tests "because they are the most significant in the face of the specific allegations of the Complaint").

24

policy interests asserted by the Executive with respect to plaintiffs' particular claims are "due" the utmost "respect" because they are offered to us pursuant to executive agreements concluded in the exercise of the President's constitutional authority to conduct foreign affairs. As set forth above, *see* Background III(a), *ante*, fifty years of international negotiations have culminated in the signing of the GSF Agreement, which is accompanied by an exchange of diplomatic notes that constitutes an executive agreement between the Government of the United States and the Austrian Federal Government. *See* United States Statement of Interest, at 6 n.4. The President's authority to settle claims through such executive agreements has long been recognized by courts, *see, e.g.*, *Garamendi*, 539 U.S. at 415 ("[T]he President has authority to make 'executive agreements' with other countries, requiring no ratification by the Senate or approval by Congress, this power having been exercised since the early years of the Republic."), and acquiesced to by Congress, *see Dames & Moore v. Regan*, 453 U.S. 654, 680-82 (1981)—particularly where, as here, "the means chosen by the President . . . provided an alternative forum, . . . which is capable of providing meaningful relief," *id.* at 686-87. The United States Government represents to us *in this case* that the GSF does not merely "provid[e] meaningful relief," *id.* at 687, but indeed "provides the best mechanism for resolving claims such as plaintiffs'." United States Supplemental Letter, at 8.

We further conclude that "a court's undertaking independent resolution" of plaintiffs' claims would "express[ ] [a] lack of . . . respect," *Baker*, 369 U.S. at 217, for the foreign policy interests of the United States as expressed in the GSF Agreement and elaborated upon in the United States Statement of Interest and Supplemental Letter. This is the "final case" holding up the implementation of the GSF. United States Supplemental Letter, at 6. In the almost five years since its initiation, this litigation has not moved beyond the threshold phase. *See* Background I-II, *ante*. Moreover, as the United States Statement of Interest underscores, "plaintiffs in this case face

25

numerous potential legal hurdles" in the future, including "justiciability, international comity, statutes of limitation, jurisdictional issues, forum non conveniens, as well as difficulties of proof inherent in these claims which originated more than 50 years ago and the various potential practical and legal obstacles to certification of a class of heirs." United States Statement of Interest, at 22. Without commenting on the legal significance of these hurdles, we cannot disagree with the Government's assertion that "[r]ecovery in this litigation is . . . by no means assured." *Id.*

In the meantime, the continued pendency of this case—and the consequent delay in the implementation of the GSF—"impedes the success of this important foreign policy initiative" and "threatens the foreign policy interests of the United States," United States Supplemental Letter, at 6, most obviously the Government's "important policy objective . . . to bring some measure of justice to Holocaust survivors and other victims of the Nazi era, who are elderly and are dying at an accelerated rate, *in their lifetimes*," United States Statement of Interest, at 15 (emphasis added). We are also particularly mindful of the United States' representation that the implementation of the GSF Agreement would advance the United States' foreign relations with Austria, as well as with Israel and Western, Central, and Eastern European nations. *See id.* at 17-19; *see also* Background III(c), *ante*. These foreign policy interests—which, we are informed, have animated the Government's "half-century effort" culminating in the signing of two recent executive agreements, United States Statement of Interest, at 19—are precisely ones that "defy judicial application," "involve the exercise of a discretion demonstrably committed to the executive," and "uniquely demand single-voiced statement of the Government's views," *Baker*, 369 U.S. at 211. In short, they counsel strongly in favor of deference to the Executive.

We therefore hold that plaintiffs' claims against Austria and its instrumentalities must be dismissed as nonjusticiable under the political question doctrine. In so holding, we defer to a United

26

States statement of foreign policy interests *in this particular case*, which is the one remaining litigation obstacle to the implementation of the GSF Agreement.[18] We conclude that we cannot "undertak[e] independent resolution without expressing lack of the respect due" the Executive Branch, *id*. at 217, because (1) the Executive Branch has exercised its authority to enter into executive agreements respecting the resolution of the claims in question; (2) the United States Government (a) has established through an executive agreement an alternative international forum for considering the

_____

[18] An "alternative" holding urged by the United States is that subject-matter jurisdiction to consider plaintiffs' claims does not lie under the FSIA. *See* United States Supplemental Letter, at 1; *see also id*. at 8-15. Although this argument is both complex and important, it need not be the first in our order of consideration. We have previously held that a federal court may consider "threshold" non-merits grounds for dismissing a claim—including, for example, deference to the foreign affairs powers of the Executive pursuant to the "political question" doctrine—before determining whether it has subject-matter jurisdiction to consider that claim. *See Can v. United States*, 14 F.3d 160, 162 n.1 (2d Cir. 1994).

More recently, the District of Columbia Circuit held that it "need not resolve the question of the district court's subject-matter jurisdiction under 28 U.S.C. § 1330—that is, whether Japan is entitled to sovereign immunity under the FSIA—before considering whether the complaint presents a nonjusticiable political question." *Hwang Geum Joo v. Japan*, 413 F.3d 45, 47-48 (D.C. Cir. 2005) (emphasizing that "a dismissal under the political question doctrine" is *not* "an adjudication on the merits") (internal citations omitted). In *Hwang Geum Joo*—which involved a suit for damages against Japan alleging atrocities committed during World War II—the Court of Appeals applied the six tests set forth in *Baker v. Carr*, 369 U.S. 186 (1962), as we do here, and concluded that "[t]he Executive's judgment that adjudication by a domestic court would be inimical to the foreign policy interests of the United States is compelling and renders this case nonjusticiable under the political question doctrine." *Id*. at 52; *see also id*. at 53 (holding that contravening the Executive's stated foreign policy interests "would be imprudent to a degree beyond [the court's] power"); *cf. Tenet v. Doe*, 125 S. Ct. 1230, 1235 n.4 (2005) (considering, before establishing subject-matter jurisdiction, the application of the *Totten* rule, which requires dismissal of cases that depend for their success on the existence of plaintiffs' secret espionage relationship with the Government); *Kowalski v. Tesmer*, 125 S. Ct. 564, 567 (2004) (assuming Article III standing in order to "address the alternative threshold question whether" attorneys had third-party standing to assert the rights of their current and future clients); *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 578 (1999) (holding, in the context of cases removed from state to federal court, that "there is no unyielding jurisdictional hierarchy" that federal courts must follow in resolving certain threshold non-merits questions); *Spargo v. N.Y. State Comm'n on Judicial Conduct*, 351 F.3d 65, 74 (2d Cir. 2003) (holding that federal courts need not follow "a strict 'sequencing of jurisdictional issues,' as it does not violate separation of powers principles to dismiss an action on a non-merits ground before finding subject-matter jurisdiction").

Accordingly, while we apply the political question doctrine to the facts of this case, we express no opinion as to whether plaintiffs could, in the absence of the United States' expressed foreign policy interests, bring their claims against Austria, a foreign sovereign, pursuant to any exceptions enumerated in the FSIA, 28 U.S.C. §§ 1605-1607. Although our dissenting colleague suggests in passing that a foreign government's expropriation of property belonging to its own nationals (as opposed to aliens) violates "universally recognized norms of international law," Dissent, at [32], this proposition is not free of doubt; indeed, it is, at a minimum, a complex and controversial question. *Cf. Amerada Hess Shipping Corp. v. Argentine Republic*, 830 F.2d 421, 429 (2d Cir. 1987) (Kearse, J., dissenting) (noting the problem of allowing jurisdiction to "ebb and flow with the vicissitudes of 'evolving standards of international law'"), *rev'd*, 488 U.S. 428 (1989).

claims in question, and (b) has indicated to this Court that, as a matter of foreign policy, the alternative forum is superior to litigation; and (3) the United States foreign policy advanced by the executive agreement is substantially undermined by the continuing pendency of this case. Due to the "case-specific" nature of our "deference to the political branches," *Sosa*, 124 S. Ct. at 2766 n.21, we need not determine whether any one of these factors is necessary or sufficient for dismissal, and we merely conclude that the dismissal of a claim against a foreign sovereign is appropriate in the circumstances presented to us here.[19]

## CONCLUSION

For the reasons stated above,

(1)     we vacate the discovery order of the District Court in No. 02-9361, and enter judgment dismissing plaintiffs' claims against Austria and its instrumentalities;

(2)     we dismiss Austria's petition for a writ of mandamus seeking to compel the District Court to rule on the pending motion to dismiss, No. 02-3087, as moot in light of our disposition of No. 02-9361; and

(3)     we remand the cause to the District Court for consideration of claims against any remaining defendants.

In remanding for further proceedings with respect to any remaining defendants, we are mindful that the implementation of the GSF—and the advancement of the foreign policies of the

---

[19] Our dissenting colleague warns that affording deference to the Executive in the circumstances presented will "undermine[ ] the FSIA by allowing the Executive to determine the fate of litigation against foreign sovereigns simply by arguing that dismissal is in the Executive's foreign policy interests." Dissent, at [39]. These fears are overstated, however, because we do not hold that the Executive Branch may, in *all* circumstances, preclude courts from assessing whether a foreign sovereign may be sued in U.S. courts pursuant to one or more of the enumerated exceptions of the FSIA; rather, we simply hold that, in the circumstances presented, deference to the Executive is appropriate. Moreover, an alternative, categorical approach that would allow federal district courts to adjudicate all questions of sovereign immunity regardless of the foreign policy considerations raised by the Executive would, in our view, more profoundly disrupt the constitutional balance of powers between the branches.

28

United States embodied in the GSF Agreement—may depend upon the dismissal of claims against such defendants. Because these claims are not, at the present time, on appeal before us, we are without jurisdiction to consider them and accordingly express no view as to whether any legal grounds exist for their dismissal.

In addition, we note the United States policy of bringing "some measure of justice" to Holocaust victims during their lifetimes, United States Statement of Interest, at 15, and the urgent request of the American Council for Equal Compensation of Nazi Victims from Austria that this Court "take affirmative action to ensure that compensation is paid to Holocaust survivors during their lifetimes," Br. of *Amicus Curiae* Am. Council for Equal Compensation of Nazi Victims from Austria, at 9. In light of these extraordinary circumstances, we direct the District Court to resolve, within sixty days after the mandate issues in this case, any motions by any party or by the Government, filed within twenty-one days after the mandate issues in this case, that seeks to dismiss on any ground (including, *inter alia*, nonjusticiability, *see* note 16 *ante*) those that must be dismissed in order for the GSF to be implemented. Should the District Court find it difficult or impossible to resolve such motions within the prescribed timeframe, this case shall be transferred to another District Judge in the Southern District of New York.

Having twice considered this case over the course of more than two years, and in the interests of judicial economy and expeditious resolution of these pressing claims, we direct the Clerk of this Court to expedite any appeal from the District Court's further orders or judgments in this case and to refer any such appeal to this panel. *See United States v. Jacobson*, 15 F.3d 19, 22 (2d Cir. 1994).

29

STRAUB, *Circuit Judge*, dissenting:

The majority holds today that claims against Austria for property taken by the Nazi regime in the lead-up to the Holocaust *must* be dismissed as nonjusticiable under the political question doctrine simply because the United States, appearing as an *amicus curiae* in this case, has filed a statement of interest urging dismissal to facilitate Austria's resolution of claims through a general settlement fund (GSF) created in January 2001. This holding is an unwarranted and troubling expansion of the nonjusticiability doctrine, which should only apply where a court, in exercising jurisdiction, would truly be exceeding its authority or contradicting foreign policy decisions by the Executive.

I understand the majority's concern for the Executive's stated foreign policy interests in providing justice to Holocaust survivors and maintaining good relations with Austria and other interested countries. I agree with the majority, moreover, that we ought to bear these interests in mind as we exercise whatever discretion the law affords us. However, the law is clear that a case does not "lie[] beyond judicial cognizance" simply because it "touches foreign relations." *Baker v. Carr*, 369 U.S. 186, 211 (1962). Indeed, this is why discretionary doctrines such as executive deference and international comity have arisen, doctrines that only apply after threshold jurisdictional issues have been decided and that require an independent judicial assessment of the weight of the interests at stake and of the adequacy of alternative relief available to the plaintiffs.

In dismissing this case at the outset under the mandatory political question doctrine based solely on an executive statement of interest, the majority effectively cedes jurisdiction to the Executive to determine, on an ad hoc basis, when cases can and cannot be brought against a foreign sovereign. Because I find this approach contrary not only to constitutional precedent but also to

30

statutory law on foreign sovereign immunity, I respectfully dissent.

## I.    Justiciability

In *Baker v. Carr*, a challenge to Tennesee's apportionment scheme, the Supreme Court rejected the state's argument that the issue presented was "nonjusticiable" (*i.e.*, not appropriately resolved through adjudication). 369 U.S. 186 (1962). In so doing, the Court spent much of its opinion systematizing the somewhat-disordered prior case law on justiciability, and identified six existing bases for dismissing a case as nonjusticiable:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217. To warrant dismissal, one of these formulations must be "inextricable from the case at bar," lest the political question doctrine become a "political cases" doctrine. *Id.* Of particular relevance here, the Court also warned that, although the *conduct* of foreign affairs is the province of the political branches, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Id.* at 211.

As the majority relies exclusively on the fourth *Baker* test, I will focus on that test as well. However, as an initial matter, I note that Whiteman's complaint clearly would survive the other *Baker* tests. With respect to the first *Baker* test, while foreign policy is committed in the first instance to the Executive, tort claims against foreign countries and individuals under the law of nations, as well as issues of sovereign immunity, are constitutionally committed to "none other than our own—the Judiciary." *Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995) (internal quotation omitted),

31

*cert. denied*, 518 U.S. 1005 (1996); *see also Alperin v. Vatican Bank*, 410 F.3d 532, 551 (9th Cir. 2005) ("Reparation for stealing, even during wartime, is not a claim that finds textual commitment in the Constitution."), *petition for cert. filed*, 74 U.S.L.W. 3146 (Sept. 7, 2005) (No. 05-326). Indeed, the Foreign Sovereign Immunity Act ("FSIA"), which, as explained below, was intended to de-politicize immunity determinations, confirms this constitutional allocation.

As for the second and third *Baker* tests, Whiteman's property claims are manageable through traditional adjudication. *See Alperin*, 410 F.3d at 551 ("[T]he Property Claims ultimately boil down to whether the Vatican Bank is wrongfully holding assets. Deciding this sort of controversy is exactly what courts do."); *id.* at 555 (finding that adjudication of whether property was wrongfully taken during WWII and valuation of property did not require any non-judicial policy determinations). Likewise, the universally recognized norms of international law invoked by Whiteman—purely for purposes of establishing jurisdiction under the FSIA—"provide judicially . . . manageable standards for adjudicating suits" and "obviate[] any need to make policy decisions of the kind normally reserved for nonjudicial discretion." *Kadic*, 70 F.3d at 249.

The fourth and sixth tests are basically coterminous with the fifth, in that they involve cases where an exercise of jurisdiction, although not *per se* outside the judiciary's authority, would somehow contradict actions taken by the political branches; I will therefore discuss them together. Given the sparsity of analysis of these factors in *Baker* and subsequent cases, one clue to what the *Baker* Court had in mind is the *sole* case cited by *Baker* for the proposition that "many [questions of foreign relations] uniquely demand single-voiced statement of the Government's view," *Baker*, 369 U.S. at 211: *Doe v. Braden*, 57 U.S. (16 How.) 635, 657 (1853).

*Braden* was an action for ejectment, in which the plaintiff claimed title to land he acquired from the Duke of Alagon, who in turn had been granted this land by the King of Spain. The King of Spain, however, had annulled this grant as part of a treaty with the United States. The plaintiff

32

argued that the King had no authority under Spanish law to annul the grant, to which the Court responded that this was a political question which the political branches had already answered by signing and ratifying the treaty. *See Braden*, 57 U.S. (16 How.) at 657. If *Braden* is the type of case the *Baker* Court had in mind–and again it is the sole case cited–then the latter tests ought be narrowly construed absent further guidance from the Supreme Court. It is hardly surprising that the *Braden* Court would find it inappropriate to decide whether a treaty between the United States and Spain was invalid on the ground that, under *Spanish* law, the King lacked the authority to make one of the stipulations in the treaty; but this hardly establishes a broad principle for other cases touching on executive foreign policy.

In fact, the Supreme Court has expressed doubt as to the importance of these last three tests (as bases for *mandatory* dismissal). *Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004) (noting that the *Baker* factors "are probably listed in descending order of both importance and certainty"); *see also Alperin*, 410 F.3d at 545 (noting, in Supreme Court and lower court opinions, a "disproportionate emphasis" on the first three factors). Moreover, in *Kadic*, we explained that, in contrast to the first three factors, the "fourth through sixth *Baker* factors appear to be relevant only if judicial resolution of a question would contradict prior decisions taken by a political branch in those limited contexts where such contradiction would seriously interfere with important governmental interests." *Kadic*, 70 F.3d at 249.

*Kadic*'s narrow reading of the latter *Baker* tests accords with one of the few Supreme Court opinions to take up the *Baker* factors: *Japan Whaling Ass'n v. American Cetacean Society*, 478 U.S. 221 (1986). In that case, the Court unanimously declined to dismiss as nonjusticiable a claim that the Secretary of Commerce had violated federal statutory law by refusing to certify that Japan's whaling

practices were undermining the effectiveness of an international fishery conservation program.[20] (Such certification would have triggered a statutory mandate that the Secretary of State impose economic sanctions on Japan.) The Court reached this conclusion despite the fact that the United States, by executive agreement with Japan, had promised under certain conditions not to impose sanctions and despite the defendants' argument that the sixth *Baker* factor would be violated by any decision "to command the Secretary of Commerce, an Executive Branch official, to dishonor and repudiate an international agreement." *Id.* at 229. While recognizing the "significant political overtones" in the case, the Court found that to dismiss the case as nonjusticiable would be to "shirk" the judiciary's responsibility to interpret and apply the law. *Id.* at 230.[21]

Guided by this case law, I find that the property claims presented by this case are clearly justiciable, notwithstanding the 2001 Agreement Between the Austrian Federal Government and the Government of the United States of America Concerning the Austrian Fund "Reconciliation, Peace and Cooperation" ("Agreement"). As the majority acknowledges, the Agreement made clear that the United States was not settling anyone's claims but was merely committing to advocate dismissal of actions brought within the United States, with the caveat that these actions would be decided by an "independent American judiciary" under neutral legal principles. *Ante* at [23 n.16].[22] Stuart E. Eizenstat, Special Representative of the President and the Secretary of State on Holocaust issues,

---

[20] Four Justices dissented on the merits but, in finding that relief was warranted, implicitly agreed that the case was justiciable.

[21] Of course, Congress had spoken in *Japan Whaling Ass'n*, an essential factor in that case. But Congress has spoken here to, in its decision, in enacting the FSIA, to depoliticize foreign sovereign immunity decisions and subject them to neutral legal principals. *See infra* at [43-44].

[22] Indeed, the majority appears to concede that the Agreement cannot be a basis for dismissal. *See ante* at 23-24 n.16 (reasoning that, even though the United States refused to commit in the Agreement to arguing a *legal ground* for dismissal, "intervening developments in foreign policy would provide an additional basis upon which the Executive Branch could now seek dismissal of this case"). Thus, despite the majority's repeated reference to the Agreement, it is clear that it is the Executive's Statement of Interest that–in an unprecedented fashion–motivates the majority's nonjusticiability holding.

confirmed this fact in his January 19, 2001, Declaration in this case, which noted that "the United States has not extinguished the claims of its nationals or anyone else." The language throughout the Agreement did likewise. For example, the Agreement provided that "[t]he United States will recommend dismissal *on any valid legal ground* which, under the United States system of jurisprudence, will be for the United States courts to determine."[23] Annex B, Oct. 24, 2000, 40 I.L.M. 523, 528 (2001) (emphasis added). The Executive specifically warned Austria that "*[t]he United States does not suggest that its policy interests concerning the Fund in themselves provide an independent legal basis for dismissal*, but will reinforce the point that U.S. policy interests favor dismissal on any valid legal ground." *Id.* at 529 (emphasis added).

Based on precisely this language in the United State's executive agreement with Germany,[24] the Court of Appeals for the Eleventh Circuit recently rejected the defendants' nonjusticiability argument. *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227 (11th Cir. 2004). There, the Eleventh Circuit stated:

> [T]he plain text of the Foundation Agreement anticipates that federal courts will consider claims against German corporations. . . . [T]he agreement itself provides that it does not provide an independent legal basis for dismissal. Thus, the executive opted not to settle these claims or to transfer the claims to the Foundation, although it had the power to do so.
> As a result, federal court consideration of the present case does not reflect a lack of respect for the executive nor does it interfere with American foreign relations. The United States is in full compliance with the Foundation Agreement so long as it files a statement of interest to courts urging respect for the Foundation as the exclusive forum to resolve these claims. . . . A statement of national interest alone, however, does not take the present litigation outside of the competence of the judiciary.

*Id.* at 1235-36 (citation and footnote omitted). The Eleventh Circuit thus concluded that a

---

[23] Ironically, the majority's decision today cuts *against* the Agreement's affirmance of the judiciary's independence.

[24] This agreement is officially titled the "Agreement Concerning the Foundation 'Remembrance, Responsibility and the Future'" and is reprinted at 39 I.L.M. 1298 (2000).

statement of interest does not render a case nonjusticiable but may still be entitled to deference, and the court afforded such deference by abstaining under an international comity analysis. *See id.* at 1236, 1237-40.

The majority disagrees with *Ungaro-Benages*, stating that the Agreement's language simply reflects a "prudent" clarification by "diplomatic representatives" regarding the possible actions by the independent American judiciary. *Ante* at [23 n.16]. The majority argues that the United States, simply by declining to guarantee dismissal to Austria, did not waive any right to argue nonjusticiability. This argument, most importantly, overlooks the fact that the United States *could have* guaranteed dismissal of domestic claims against Austria by entering into a settlement agreement or treaty. *See Ungaro-Benages*, 379 F.3d at 1235 & n.11 (providing examples of United States settlements extinguishing domestic claims against foreign governments); *cf. Dames & Moore v. Regan*, 453 U.S. 654, 665 (1981) (quoting language from executive agreement with Iran explicitly obligating the United States "'to terminate all [relevant] legal proceedings in United States courts'"); *Hwang Geum Joo v. Japan*, 413 F.3d 45, 49-51 (D.C. Cir. 2005) (noting how 1951 Treaty waived claims by Allied Powers and their nationals against Japan arising out World War II), *petition for cert. filed*, No. 05-543 (Oct. 26, 2005). That the Executive declined to exercise this power makes its reservations a deliberate policy choice rather than mere "prudent" cautionary statements.

In fact, the history of the settlement negotiations confirms that the Executive's refusal to waive all existing and potential claims against Germany (and, by dint of the parallel language in the two agreements, Austria) was an *intentional part of* its foreign policy. As Stuart Eizenstat, the United States' negotiator of these agreements, reveals in his book about the project, Germany doggedly sought further assurance of a legal peace and was rebuffed.[25] Stuart E. Eizenstat, Imperfect Justice:

---

[25] I note that, contrary to the majority's implication, *see ante* at [24 n.16], I am in no way relying on Eizenstat's book for my understanding of the Agreement. Rather, the book is useful in confirming that the language of the Agreement means what it says and is not simply, as the majority surmises at *ante* [23 n.16], carefully vague diplomatic

Looted Assets, Slave Labor, and the Unfinished Business of World War II 269-78 (2003). In particular, Germany sought "a definitive commitment by the United States to support some legal ground for the dismissal of future suits, rather than simply stating that dismissal was in our foreign policy interests," but the United States "held fast" to its refusal to "take a formal legal position barring U.S. citizens from their own courts." *Id.* at 269. In fact, Germany was warned that if it attempted to portray the agreement as barring all future litigation, the Justice Department would make clear its position "to the contrary." *Id.* at 270. And Seth Waxman, Solicitor General at the time and the most adamant opponent within the Administration to allowing the agreement to be construed as barring litigation, crafted the "creative formulation" in the executive agreement that the Executive would file statements of interest favoring dismissal "on any valid legal ground." *Id.* at 271. Knowing full well that it had achieved imperfect legal peace at best, Germany signed the agreement, and the following year, Austria signed an agreement containing an identically worded commitment by the Executive to file statements of interest.

In finding this case justiciable, then, we would do no more than what was anticipated in the Agreement, and therefore would show no disrespect for the Executive, nor impermissibly interfere with foreign relations or send any contradictory foreign policy message. To the contrary, the *majority*'s interpretation undermines the political balance clearly struck by the Executive between assuring Austria of its support for the GSF and refraining from settling victim's claims.

I also find it telling that the Executive has not, at any point in this litigation, suggested to this Court that Whiteman's claims are nonjusticiable. In fact, it has implied the contrary. The majority glosses over this fact by broadly reading the Executive's limited statement in its Supplemental Letter that recent Supreme Court case law "confirms the substantial weight that a court should give to the

speech. Nor is there any inconsistency between Eizenstat's observation in his book that the Administration refused to waive victims' claims–a policy decision with which Eizenstat apparently disagreed–and his statement in this case that dismissal would be in the Executive's foreign policy interests.

37

views of the Executive on this nation's foreign policy in deciding whether to exercise jurisdiction [under the FSIA]." *Ante* at [20]. As this sentence makes clear, however, the Executive was invoking—not the nonjusticiability doctrine—but rather the discretionary doctrine of executive deference, discussed below in Part II.

In fact, the Executive does not even suggest that its interests, standing alone, would support *discretionary* dismissal. Rather, the Executive states that "it is in the foreign policy interests of the United States for this action to be dismissed on any valid legal ground," and argues that we should defer to its interests "[t]o the extent that [they] are *relevant* to any *legal arguments* advanced by the defendants in seeking dismissal" (emphasis added). This limiting language echoes the carefully-worded promise in the Agreement and appears throughout the letter, which elsewhere characterizes the Executive's interest as "relevan[t]" and deserving of an "important role" and "serious weight" in the judicial determination of whether to exercise jurisdiction. Most tellingly, the Executive appealed to "abstention doctrines under which the United State's foreign policy interests are potentially relevant to a court's determination whether to exercise jurisdiction," such as international comity and forum non conveniens, rather than to the political question doctrine.

The modesty of the Executive's request (relative to the majority's holding) reflects the legal background to this case. For better or worse, Congress specifically enacted the FSIA to uncouple foreign sovereign immunity decisions from ad hoc foreign policy decisions. As the House Report explained:

> A principle purpose of [the FSIA] is to transfer the determination of sovereign immunity from the executive branch to the judicial branch, thereby reducing the foreign policy implications of immunity determinations and *assuring litigants that these often crucial decisions are made on purely legal grounds* and under procedures that insure due process . . . [thereby] conform[ing] to the practice in virtually every other country . . . .

H.R. Rep. No. 94-1487, at 7 (1976) (emphasis added), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6606; *see*

*also Verlinden B.V. v. Cent.*, 461 U.S. 480, 488 (1983) ("Congress passed the [FSIA] in order to free the Government from the case-by-case diplomatic pressures, to clarify the governing standards, and to 'assur[e] litigants that . . . decisions are made on purely legal grounds . . . .'" (quoting House Report)). The majority's decision today undermines the FSIA by allowing the Executive to determine the fate of litigation against foreign sovereigns simply by arguing that dismissal is in the Executive's foreign policy interests.

In sum, my understanding of the political question doctrine for cases touching on foreign relations is as follows: Unless there is a clear constitutional commitment to the political branches or some other factor placing the case beyond normal judicial competence, a case may be nonjusticiable only if its resolution "would contradict prior foreign policy decisions taken by the political branch"—here, the Executive. *Kadic*, 70 F.3d at 249. In this case, the operative foreign policy decision is the negotiation of the Agreement, which expressly contemplates the judiciary's authority to hear these cases and in which the Executive expressly declined to require their dismissal. The majority, however, finds that the Executive's Statement of Interest, even without any actual contradiction with a prior foreign policy decision, is sufficient to render the case nonjusticiable. While the foreign policy interests asserted in this case might, upon further analysis, be sufficient to warrant dismissal under the discretionary doctrine of international comity, the majority's expansion of the mandatory political question doctrine is unsupported and troubling in its potentially wide-reaching implications.

## II. Executive Deference

In an effort to shore up its justiciability analysis, the majority finds its holding "greatly reinforced" by the Supreme Court's recent case law suggesting an executive deference ground for dismissal in cases implicating our foreign relations. *Ante* at [22-23]. Indeed, an ambiguous association between the (mandatory) political question doctrine and the (discretionary) doctrine of

executive deference pervades the majority opinion, which alternatingly states that "deference is "appropriate," *see id.* at [20-21 & 27 n.18], and "hold[s] that plaintiffs' claims against Austria and its instrumentalities must be dismissed as nonjusticiable under the political question doctrine," *see id.* at [26].

The majority's conflation of these two doctrines is contrary to the sparse existing precedent on executive deference as an independent ground for dismissal. In *Republic of Austria v. Altmann*, the main case on which the majority relies for the doctrine of executive deference, the Supreme Court stated in dicta that, "should the State Department choose to express its opinion on the implications of exercising jurisdiction over particular petitioners in connection with their alleged conduct, that opinion *might* well be entitled to deference as the considered judgment of the Executive on a particular question of foreign policy." 541 U.S. 677, 702 (2004) (emphasis added). At the same time, the Court "express[ed] no opinion on the question of whether such deference *should* be granted in cases covered by the FSIA," *id.* (emphasis added), and disclaimed any holding "that executive intervention could or would trump considered application of the FSIA's more neutral principles," *id.* at 702 n.23.

Likewise, in a subsequent case, the Supreme Court stated in passing dicta that, with regard to litigation under the Alien Tort Statute against corporations which allegedly participated in the apartheid in South Africa, "there is a strong argument that federal courts should give serious weight to the Executive Branch's view" that such litigation interferes with the work of the Truth and Reconciliation Commission (which favors "confession and absolution" over "victors' justice"). *Sosa v. Alvarez-Machain*, 542 U.S. 692, __, 124 S. Ct. 2739, 2766 n.21 (2004) (noting that the Court "need not apply" in that case the "*possible* limitation . . . of case-specific deference to the political branches" (emphasis added)).

As is clear from the language of *Altmann* and *Sosa*, the Supreme Court has indicated that, in

40

some cases, executive statements of interest might be entitled to significant weight, but it has declined to specify how and when this rule might apply. Certainly, nothing in the language of these cases suggests that dismissal would be *required* in deference to executive statements—not least because the *Altmann* and *Sosa* majorities never mention justiciability.[26] To the contrary, *Altmann* stated: "We do *not* hold . . . that executive intervention could or would trump considered application of the FSIA's more neutral principles." *Altmann*, 541 U.S. at 702 n.23 (emphasis added).

The majority attempts to tie the executive deference and political question doctrines together by citing to our decision in *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995), arguing that in that case we relied on statements of interest in applying the political question doctrine. With respect, I disagree with this characterization. In *Kadic*, we held justiciable international law claims by victims of the Bosnian-Serb leader Radovan Karadzic for atrocities committed in the Bosnian civil war. In so holding, we noted that the United States had filed a statement of interest expressly disclaiming any concern that the case raised a political question. We stated that "[t]hough even an assertion of the political question doctrine by the Executive Branch, entitled to respectful consideration, would not necessarily preclude adjudication, the Government's reply to our inquiry reinforces our view that adjudication may properly proceed." *Id.* at 250. As this language makes clear, *Kadic* in no way supports the majority's position that courts may rely on an executive statement in finding a case nonjusticiable, particularly where, as here, the Executive has not even *asserted* that the case is nonjusticiable.[27]

---

[26] However, Justice Breyer, joined by Justice Souter in a concurrence, stated in passing that the Executive could file a statement of interest counseling dismissal on various grounds, including nonjusticiability. *Altmann*, 541 U.S. at 714 (Breyer, J., concurring). Justice Breyer did not specify what weight such a statement should be accorded or what other circumstances, if any, would need to be presented to support dismissal.

[27] For this reason, I must respectfully disagree with the majority's statement, without any citation beyond *Kadic*, that "our decisions . . . have properly relied on . . . [executive] statements of interest" in determining justiciability, *ante* at [23].

The majority also cites *Hwang Geum Joo v. Japan*, 413 F.3d 45 (D.C. Cir. 2005), which held nonjusticiable claims under the Alien Tort Statute against Japan by foreign nationals from China, Taiwan, South Korea, and the Philippines for

As set forth *supra*, the executive deference doctrine suggested by *Altmann* and *Sosa* is distinct from the justiciability doctrine applied here by the majority. More importantly, the majority's conflation of the two sets a dangerous precedent. The justiciability doctrine is severe in its consequence: *mandatory* dismissal. But this severity is mitigated by the narrowness of its scope, which includes only those cases where the judiciary would truly be exceeding its constitutional authority, not simply treading on areas of overlapping authority. Conversely, the doctrine of executive deference is broad in its scope—potentially applying wherever the executive files a statement of interest counseling dismissal—but limited in its effect because it preserves judicial discretion and contemplates that other factors might override the Executive's interest.

By joining the two doctrines here as a threshold basis for dismissing this case, the majority creates the potential for a strikingly broad doctrine mandating dismissal whenever the Executive argues that an issue presented to the court threatens to intrude on its foreign policy interests. I find the prospect of such a doctrine troubling as well as novel. Accordingly, I respectfully dissent.[28]

---

crimes involving sexual slavery during World War II. Although the D.C. Circuit gave weight to the Executive's statement of foreign policy that claims against Japan be resolved through negotiation between states, it also relied on a 1951 Treaty between Japan and the Allied Powers "expressly waiv[ing]" the claims of all Allied citizens and found that it would be absurd if foreign nationals had more rights than American citizens in this regard. *See id.* at 49-50. Moreover, in *Huang Geum Joo*, unlike in this case, the Executive's statement of interest argued that the case was nonjusticiable and provided reasons based on the first through third *Baker* tests for finding the case nonjusticiable. *See id.* at 51.

[28] Because I find the issues presented in this case clearly justiciable, I would remand for a determination of whether circumstances permit and warrant discretionary deference to the executive foreign policy interests stated here. In so doing, I would reject Austria's other major threshhold objection to jurisdiction, which the majority does not reach: namely, that plaintiffs have failed to plead "rights in property taken in violation of international law are in issue," *see* 28 U.S.C. § 1605(a)(3), because international law only limits state expropriation of foreign properties. I would find that international law clearly prohibits expropriation committed in furtherance of genocide and other grave human rights violations, such as is pled here.