334 F.Supp.2d 690 (2004)
In re NAZI ERA CASES AGAINST GERMAN DEFENDANTS LITIGATION.
Simon Rozenkier, Plaintiff
v.
Schering AG & Bayer AG, Defendants.
No. Civ. 03-3413(WGB).
United States District Court, D. New Jersey.
September 10, 2004.
*691 Stephen A. Whinston, Esq., Berger & Montague, P.C., Philadelphia, PA, for Plaintiff.
John J. Gibbons, Esq., Gibbons, Del Deo, Dolan, Griffinger & Veccione, PC, One Riverfront Plaza, Newark, NJ, Roger M. Witten, Esq., Wilmer Cutler Pickering LLP, New York City, for Defendants.

OPINION
BASSLER, District Judge.
Simon Rosenkier is now 78 and lives in Staten Island, New York. During World War II, however, Rozenkier was a prisoner in the Auschwitz-Birkenau concentration camps. Among the told and untold cruelties Rozenkier endured as a Nazi prisoner, in 1944, were numerous hypodermic injections into his testicles, causing the swelling and bleeding of his genitalia. See Pl.'s Memo. in Opp., Ex. 6(A); Compl. ¶¶ 21-23. After his liberation from Auschwitz-Birkenau, Rozenkier emigrated from Poland to the United States where, within a few years, he was drafted into the U.S. army and deployed to Korea. Following the Korean War, in 1952, Rozenkier married. He was unable to have children, however. In 1956, the cause of his sterility was yet unresolved as a medical diagnosis served inconclusive; it was not until 1999 that Rozenkier learned definitively that his "infertility was the result of a Nazi `medical experiment.'" See Pl.'s Memo. in Opp., Ex. 6(A) at 6-7; id., Ex. 6, ¶ 9.
On March 25, 2003, Rozenkier filed a complaint (the "Complaint") in the Eastern District of New York. He claims, in part, that Schering AG's and Bayer AG's (the "Defendants") complicity with the Nazi regime violated international law.[1] Specifically, Rozenkier alleges that Defendants participated in secret experiments, such as the one performed on him in 1944, in order to evaluate the efficacy of "mass sterilization" drugs manufactured by Defendants. He "seeks full disclosure of the chemical substance used to sterilize him, as well as compensatory and punitive damages...." Compl. ¶ 3.
*692 Shortly after the filing of the Complaint, the Judicial Panel on Multidistrict Litigation (the "MDL Panel"), recognizing that the Complaint "involves questions of fact which are common to the actions previously transferred" to this Court, ordered a conditional transfer of the action from the Eastern District of New York. See MDL Conditional Transfer Order (June 24, 2004). The transfer was effected in August 2003 and consolidated with MDL Docket No. 1337: In re Holocaust Era German Industry, Bank & Insurance Litigation. On March 12, 2004, Defendants moved to dismiss the complaint. They argue principally that Rozenkier's claims are nonjusticiable. The Court agrees and offers the following rationale.

Introduction
The Court's intimacy with Holocaust-related cases, particularly those lawsuits filed by American plaintiffs against German corporations, began formally on August 4, 2000. It was then that the MDL Panel consolidated approximately 50 Nazi-era cases before this Court following a "motion for centralization" pursuant to 28 U.S.C. § 1407. The consolidation occurred in light of "an important international agreement which promise[d] to present significant common pretrial issues pertaining to the settlement or dismissal of the actions." MDL Transfer Order, Docket No. 1337.
On July 17, 2000 an agreement (the "Joint Statement") was signed between interested federal governments including those of Germany and the United States, German corporations ("German Industry") and attorneys of various plaintiffs, who agreed to dismiss their lawsuits against German Industry in exchange for the creation of the German Foundation "Remembrance, Responsibility and the Future" (the "Foundation"). Concurrently, the Governments of the Germany and United States signed an executive agreement (the "Executive Agreement") that reflected the commitments of the two governments to the Foundation. The Foundation's funding was to be shared equally by the German Government and German Industry in the amount of DM 10 billion.
As the Court noted in In re Nazi Era Cases Against German Defendants Litigation, 320 F.Supp.2d 235, 238 (D.N.J.2004), the Foundation has recently "[paid] out over DM 5.5 billion to more than 1.5 million victims of Nazi persecution during its two and one-half years of existence." These victims include "forced or slave laborers and those who suffered at the hands of German [Industry] during the National Socialist era[.]" Pl.'s Memo. in Opp., Ex. 1, Annex A, ¶ 1 (the Executive Agreement). In return for the Foundation's principal funding, the parties to the Joint Statement "[a]ccept[ed] the common objective that German [Industry] receive all embracing and enduring legal peace." Id., Ex. 2 at 3. The United States recognized the importance of such "all-embracing and enduring legal peace[.]" Id., Ex. 1, Art. 2(2). To that end, the Executive Agreement states:
[T]he United States will timely file a Statement of Interest and accompanying formal foreign policy statement of the Secretary of State and Declaration of Deputy Treasury Secretary Stuart E. Eizenstat in all pending and future cases, regardless of whether the plaintiff(s) consent(s) to dismissal, in which the United States is notified that a claim has been asserted against German companies arising from the National Socialist era and World War II.
Id., Ex. 1, Annex B at 1 (emphasis added). The Complaint is such a "future case[ ]" anticipated by the Executive Agreement.

Statement of Interest
In accordance with the terms of the Executive Agreement, the United States *693 filed a statement of interest (the "Statement of Interest") in this action. The Statement of Interest recognizes that "[t]hose who suffered ... non-labor-related personal injuries, such as being subject to medical experimentation ..., are eligible to apply for payments" from a designated pool of Foundation money. See Statement of Interest at 7 (Mar. 15, 2004). Because "all victims who suffered injury  including medical experimentation  at the hands of German [Industry] are eligible to apply for [Foundation] benefits ... includ[ing], by definition, the plaintiff in this litigation [Rozenkier] [,]" the United States concludes that the Foundation provides a fair remedy for all victims of the Nazi regime and German Industry, including Rozenkier. Id. at 8, 11. As such, the Statement of Interest recommends that the action should be dismissed because "all asserted claims should be pursued through the Foundation instead of the courts" in accordance with United States foreign policy interests. Id. at 11; see id. at 11 n. 5 ("The United States maintains this policy in the current administration.")

Rozenkier's Foundation Claims
After the execution of the Joint Statement and the Executive Agreement, the German Bundestag accordingly enacted the Law on the Creation of a Foundation "Remembrance, Responsibility and Future" (hereinafter, the "Foundation Law"), which was entered into force on August 12, 2000. See Valen Decl., Ex. 3 at 1. The Foundation Law "set aside DM 50 million for cases of `other personal injury,' including cases of `medical experiments,' such as those alleged in the Complaint." Defs.' Memo. in Supp. at 2-3; see Valen Decl., Ex. 3, § 9(3). Consequently, Rozenkier applied for his tranche from the DM 50 million reserve.[2] Notwithstanding that application, Rozenkier also filed the Complaint seeking additional relief.
The Foundation Law provides explicitly that "partner organizations ... shall determine the merits and amount of the damage claimed." Valen Decl., Ex. 3, § 9(3) (emphasis added). The "amount of compensation," however, "shall be determined by the [Commission] in accordance with the ratio between the totality of damages recognized by the partner organizations" and in consideration of the DM 50 million allotment. Id.
The Foundation Law grants the authority to "establish supplemental principles concerning the content and procedure of [the Commission's] determinations, insofar as these are not already established under [the Foundation] Law or the by-laws." Id., Ex. 3, § 9(6). Pursuant to that authority, the partner organizations and the Foundation's Board of Directors approved certain guidelines, which were then unanimously approved by the Foundation's Board of Trustees on June 21, 2001. The guidelines categorized "other personal injuries" into three groups and assigned respective compensation ceilings available *694 for each category of injury. Victims of medical experimentation "[are] to be given priority under the [Foundation] Law in providing compensation ... up to DM 15,000." Pl.'s Memo. in Opp., Ex. 9 at 6. However, if the DM 50 million earmarked for victims of "other personal injuries" is not sufficient, each victim would receive a reduced pro rata amount. See id. In the end, the pro rata approach was followed.
Rozenkier's application to one of the Foundation's "partner organization"  in this case, the Conference on Jewish Material Claims Against Germany, Inc.  was approved by letter dated February 6, 2004. See Pl.'s Memo. in Opp., Ex. 7 at 1. That letter stated, in part:
On the basis of the information you provided and the evidence you submitted, your eligibility has been established as a "victim of medical experiments."

. . . . .
Under the Foundation Law, the total amount of the payment to each person depends on the total number of persons who are eligible to receive a payment. Now that all of the applications have been processed, it has been established that every person eligible in connection with other personal injuries shall receive a payment of 4243.72(EUR).
The same amount is being paid to each eligible person and therefore it is not possible to file an appeal with the Independent Appeals Authority regarding the amount of payment.
Id., Ex. 7 at 1. A check made payable to Rozenkier in the amount of U.S. $5,348.36 was also forwarded to Rozenkier.
Shortly thereafter, Defendants filed the current motion to dismiss. In addition to the claims in the Complaint, which Rozenkier labels as "a private individual tort action for damages against private corporate defendants[,]" see Pl.'s Memo. in Opp. at 3, Rozenkier also argues that the compensation amount was unilaterally altered by the Foundation's Board of Trustees. See id. at 2, 17. Furthermore, he now argues that the Foundation eliminated the right to file an appeal with the Independent Appeals Authority. See id. These actions, according to Rozenkier, "voided the validity of any waiver or release to which [he] purportedly agreed." Id. at 17.

Discussion
Rozenkier alleges that scientists and technicians employed by Defendants "personally attended the experimental procedures performed on [him] and analyzed the results of the experiments." Compl. ¶ 22. Broadly, Rozenkier alleges that the chemical sterilization experiments at Auschwitz-Birkenau were conducted with "the knowledge, consent and/or participation" of both Schering AG and Bayer AG "for the express purpose of assisting, facilitating and expediting the Nazi program of genocide." Id. ¶¶ 25-26.
Despite the factual allegations of Defendants' wrongdoing during World War II, Defendants are insulated from suit here as a result of decades-long negotiations between governments, victims of Holocaust atrocities, their lawyers and German Industry which culminated in the Joint Statement and the Executive Agreement described above.[3] Defendants are German corporations. Schering AG has its principal place of business in Berlin. Bayer AG has its principal place of business in Frankfurt. The protections afforded by the Joint Statement and the Executive *695 Agreement to German Industry extend to both corporations.
As provided above, the Joint Statement is a written assurance that with the establishment and proper funding of the Foundation, German Industry, which includes Defendants, will "receive all embracing and enduring legal peace" as it relates to their involvement[4] in Nazi-era atrocities. The Executive Agreement essentially guarantees that United States will further that goal if future lawsuits are filed in U.S. courts. What Rozenkier considers a "private individual tort action for damages against private corporate defendants" falls squarely within the estimable bounds of litigation anticipated by the Executive Agreement.
As such, the Court is restrained from adjudicating the merits of the Complaint due to foreign policy considerations. In other words, the political question doctrine counsels the Court to dismiss this action. In a steady line of cases, this Court has maintained that
[t]he executive branch has always taken the position that claims arising out of World War II must be resolved through government-to-government negotiations. Thus, allowing private litigation of war-related claims would express a lack of respect for the executive branch.
Iwanowa v. Ford Motor Co., 67 F.Supp.2d 424, 486 (D.N.J.1999); In re Nazi Era Cases, 320 F.Supp.2d at 253; see Frumkin, 129 F.Supp.2d at 377. The promulgation of the Executive Agreement punctuates the Executive Branch's consistent position. The Statement of Interest that was filed in this action, pursuant to Annex B of the Executive Agreement, advises this Court "of its foreign policy interests ... in the Foundation being treated as the exclusive remedy for World War II and Nazi era claims against German companies, and, concomitantly, in current and future litigation being dismissed." Statement of Interest, Ex. 1, ¶ 14 (Eizenstat Declaration).
The seminal case addressing the political question doctrine is Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Baker held that the "nonjusticiability of a political question is primarily a function of the separation of powers." Baker, 369 U.S. at 210, 82 S.Ct. 691. At times, respect duly owed to the other branches of government "limits the exercise, not the existence of federal judicial power." Atlee v. Laird, 347 F.Supp. 689, 701 (E.D.Pa.1972). As such, the Supreme Court provided that if any one of the following factors is "inextricable from the case[,]" the reviewing court must decline to address the nonjusticiable political question:
Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing *696 lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
Baker, 369 U.S. at 217, 82 S.Ct. 691; see In re Nazi Era Cases, 320 F.Supp.2d at 250. Here, at minimum, the latter two factors are implicated.
If this Court adjudicated the Complaint, it would do so against the recommendation of the Executive Branch. The Statement of Interest provides: "Because of the United States' strong interests in the success of the Foundation, and because such success is predicated on the dismissal of this litigation, the United States recommends dismissal on any valid legal ground." Statement of Interest at 2. Failure to dismiss this action would consequently "express[ ] lack of the respect due coordinate branches of government" as well as cause "embarrassment from multifarious pronouncements by various departments on one question."
There is no compelling reason the Court should do otherwise. In Frumkin, this Court was faced with the same executive consideration. Frumkin was one of the approximately 50 Nazi-era cases that were consolidated before the Court in 2000. Almost all of the cases were voluntarily dismissed with prejudice in light of the Foundation's creation;[5] however, Frumkin chose to prosecute his action against various German corporations. Like Rozenkier, Frumkin argued that his claims "should be treated as typical tort claims brought by an individual against a private company ... as his claims hinge[d] on the conduct of individual defendants, versus the conduct of the Nazi government." Frumkin, 129 F.Supp.2d at 377. This Court noted, however, that "the creation of the Foundation now leaves [Frumkin] grasping at an irrelevant distinction." Id. In Frumkin, the Court held that "[n]either the Executive Agreement nor the Statement of Interest per se provide an adequate legal basis for achieving the requisite dismissals, but they do provide the Court with a clear expression of the will of the Executive branch in the realm of foreign affairs." Id. at 382. Although the Executive Agreement and the Statement of Interest did not "provide an independent legal basis for dismissal, the long-standing foreign policy commitment to resolving claims arising out of World War II and the Holocaust at a governmental level [did] provide such a basis." Id. Thus, the Court in Frumkin determined that if the action was allowed to continue, "it would run afoul of the political question doctrine[,]" specifically with regard to the two factors identified above. Id. (citing Baker, 369 U.S. at 217, 82 S.Ct. 691).
Here, the Court again adopts the Frumkin holding. The wrongdoings alleged against Defendants arose directly from their involvement in the Nazi era and World War II. The history of foreign policy commitments devoted to the resolution of Holocaust-era claims, coupled with the relatively recent creation of the Foundation, renders such claims nonjusticiable in this Court. Instead, the proper forum for *697 restitution or compensation for Holocaust survivors and other victims of the Nazi era is the Foundation.[6]
Finally, as for Rozenkier's remaining request for information, specifically, "the full disclosure of the chemical substance used to sterilize him," the Court's understanding is that the Foundation Law does not mandate answers to such requests. Although the Foundation Law permits Foundation applicants to "request information from enterprises in Germany for which or for whose legal predecessors they performed forced labor, insofar as this is [a] requisite for determining their eligibility for awards[,]" Rozenkier's request does not fall within its parameters. See Valen Decl., Ex. 3, § 18(3). Notwithstanding the outstanding nature of Rozenkier's information request, the Court cannot order discovery here.[7] The gravamen of the Complaint is nonjusticiable on political question grounds.

Conclusion
For the foregoing reasons, Defendants' motion to dismiss on the ground of nonjusticiability is GRANTED.
NOTES
[1] The Complaint adds counts of negligence, negligent/intentional infliction of emotional distress, assault and battery, conspiracy, fraud and breach of a drug manufacturer's duty to warn. See Compl. ¶¶ 49-99.
[2] Rozenkier "executed his Slave Labor Application" approximately three months prior to June 21, 2001. See Pl.'s Memo. in Opp. at 17. Defendants have produced a copy of an application form signed by Rozenkier dated March 1, 2001. See Valen Declaration, Ex. 7. It is unclear, however, whether that application is independent from his claim pertaining to the medical experiments performed on him during World War II. Regardless, "the ability of a victim to receive benefits for `other non-labor personal injury wrongs'" [is] not ... affected by whether or not he or she also receive[d] benefits for forced labor." Pl.'s Memo. in Opp., Ex. 8 at 1 (Letter from Otto Graf Lambsdorff to Eizenstat dated July 11, 2000). It appears that Rozenkier was issued two compensation checks  one totaling U.S. $4,645.09, which was endorsed by Rozenkier and deposited, see Valen Decl., Ex. 8, and another for U.S. $5,348.36. See Pl.'s Memo. in Opp., Ex. 7 at 3. It is unclear whether the latter check was cashed by Rozenkier.
[3] A detailed history of the events leading up to these agreements can be found in Am. Ins. Ass'n v. Garamendi, 539 U.S. 396, 123 S.Ct. 2374, 2380-82, 156 L.Ed.2d 376 (2003). See also this Court's prior opinions in In re Nazi Era Cases Against German Defendants Litigation, 198 F.R.D. 429 (D.N.J.2000), and In re Nazi Era Cases Against German Defendants Litigation ("Frumkin"), 129 F.Supp.2d 370 (D.N.J.2001).
[4] Defendants point out that "Bayer AG was created in 1951 and did not exist during the Nazi era. In 1925, a company called Friedrich Bayer & Co. of Leverkusen was absorbed into I.G. Farbenindustrie AG[.] At the end of World War II ... the Allies seized I.G. Farben, liquidated it, and created a new legal entity called Bayer AG." Defs.' Memo. in Supp. at 19. At this point, however, it is unnecessary to determine the precise nature, if any, of Bayer AG's involvement in Holocaust-related atrocities. Even if Bayer AG existed during World War II, one of the Executive Agreement's definition of "German companies" would apply, and Rozenkier's claims against it would remain nonjusticiable.
[5] One such action was Kriegel v. Bayer AG, Civ. No. 99-2270(WGB) (D.N.J.). Plaintiffs there filed claims against Defendants and Hoeschst AG, another German corporation. Like Rozenkier, the named plaintiffs in Kriegel, all formerly imprisoned in Auschwitz, alleged that Defendants "provided toxic chemicals to the Nazis, who used those products to perform medical `experiments' upon concentration camp inmates such as the Plaintiffs." Kriegel Compl. ¶ 1. Kriegel was voluntarily dismissed with prejudice following the implementation of the Foundation pursuant to the Joint Statement and Executive Agreement. See Kriegel Order (Nov. 16, 2000).
[6] As for Rozenkier's allegation in the Complaint that the Foundation unilaterally altered the compensation calculation formula for victims of medical experiments, see Compl. ¶¶ 38-39, the Court notes that the allegation is not directed at Defendants. Further, Rozenkier's most recent argument that he cannot avail himself to an appeals process is also irrelevant to Defendants' alleged acts during World War II. Therefore, a detailed discussion of those points is not required here. Nevertheless, the Court's view is that the Foundation's Board of Trustees adoption of the pro rata distribution of the earmarked DM 50 million to victims of medical experimentation was not "unilaterally" decided. Instead, pursuant to the terms of the Foundation Law, specifically §§ 9(3) and 9(6), see Valen Decl., Ex. 3, twenty-two members of the Foundation's Board of Trustees unanimously approved the guidelines that led to the pro rata dispensation after the same guidelines were first passed by the "partner organizations" and the Foundation's Board of Directors. See Pl.'s Memo. in Opp., Ex. 9 at 5. Also the minutes of the Board of Trustee's meeting states that the guidelines were also "agreed with the American side and with the German Government." Id. As this Court stated in In re Nazi Era Cases Against German Defendants Litigation, 213 F.Supp.2d 439, 447 n. 11 (D.N.J.2002), "the Court is absolutely certain that matters pertaining to the operation of the Foundation are beyond the purview of American courts, and must be resolved via existing mechanisms in Germany." Therefore, the Court will not upset the Foundation's internal operation which decided how the funds are to be distributed in accordance with the Foundation Law.
[7] However, Defense Counsel provided informal discovery. See letter from Roger M. Witten to Carey R. D'Avino and Stephen A. Whinston of 10/21/03 advising that clients searched company's archives and public information without discovering "any information relating to Mr. Rozenkier or the substance to which he may have been exposed ... or any connection between [Defendants] and sterilization experiments ..." and advising that transcripts of the Nuremberg Military Tribunals mention that Nazi doctors in chemical sterilization experiments used a substance called caladium seguinum.