

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-2-2006

# Rozenkier v. AG Schering

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-3934

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Rozenkier v. AG Schering" (2006). *2006 Decisions*. Paper 634.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/634

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 04-3934
_____

IN RE: NAZI ERA CASES AGAINST
GERMAN DEFENDANTS LITIGATION

SIMON ROZENKIER,

Appellant

v.

AG SCHERING; BAYER AG

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 03-cv-03413)
District Judge: Honorable William G. Bassler

_____

Argued September 26, 2005

BEFORE: ALITO,[*] AMBRO, and LOURIE,[**] <u>Circuit Judges</u>

(Opinion filed: August 2, 2006)

Carey R. D'Avino, Esquire
Stephen A. Whinston, Esquire (Argued)
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA  19103

 Counsel for Appellant

John J. Gibbons, Esquire
Thomas R. Valen, Esquire
Gibbons, Del Deo, Dolan, Griffinger & Vecchione
A Professional Corporation
One Riverfront Plaza
Newark, NJ   07102

Roger M. Witten, Esquire (Argued)
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue

---

*Then Judge, now Justice, Alito heard oral argument in this case but was elevated to the United States Supreme Court on January 31, 2006.  The opinion is filed by a quorum of the panel.  28 U.S.C. § 46(d).

**Honorable Alan D. Lourie, Circuit Judge for the United States Court of Appeals for the Federal Circuit, sitting by designation.

New York, NY 10022

Counsel for Appellees

_____

OPINION OF THE COURT
_____

LOURIE, Circuit Judge

Simon Rozenkier appeals from the decision of the United States District Court for the District of New Jersey granting Schering AG's and Bayer AG's (the "Appellees") motion to dismiss Rozenkier's complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). In re Nazi Era Cases Against German Defendants Litigation, 334 F. Supp. 2d 690 (D.N.J. 2004) ("Decision"). Because Rozenkier's claims are nonjusticiable under the political question doctrine, we affirm.

## I. BACKGROUND

This case arises from the horrific, widespread crimes perpetrated by the Nazi government during World War II. Rozenkier, a Holocaust survivor, was subjected to inhumane Nazi medical experimentation while he was imprisoned at the Auschwitz-Birkenau concentration camps. Decision, 334 F. Supp. 2d at 691. During his internment in 1944, he was forced to undergo injections of unknown chemical substances into his

3

testicles causing swelling and bleeding of his genitalia.  Id. After his liberation from Auschwitz-Birkenau, Rozenkier emigrated from Poland to the United States.  Id.  In 1952, he married but was unable to have children.  Id.  The cause of his sterility remained unknown until 1999, when Rozenkier learned definitively that his "infertility was the result of a Nazi 'medical experiment.'"  Id.

Rozenkier's case does not arise in isolation.  In the late 1990's, Holocaust survivors filed a number of class action lawsuits seeking compensation from German corporations who allegedly participated in Nazi-era crimes arising from slave and forced labor during World War II.  In 1998, at the request of the German government, the United States government agreed to facilitate the resolution of those lawsuits.  Following the personal involvement of the President of the United States and German Chancellor Schroeder, the federal governments of the United States and Germany, German corporations, and attorneys for various plaintiffs agreed that the plaintiffs would voluntarily dismiss their lawsuits in exchange for the creation of the German Foundation "Remembrance, Responsibility and the Future" (the "Foundation"), which would make payments to Nazi victims from a DM 10 billion pool.

On July 17, 2000, the United States and German governments signed an agreement (the "Joint Statement") expressing their support for the Foundation. Joint Statement, at 3.  Concurrently, the two governments signed an executive agreement (the "Executive Agreement") recognizing the desire

4

of the two governments for an "all embracing and enduring legal peace to advance their foreign policy interests" and reflecting their commitments to the Foundation as "the <u>exclusive remedy and forum</u> for the resolution of . . . <u>all claims that have been or may be asserted</u> against German companies arising from the National Socialist era and World War II," Executive Agreement, Art. 1(1) (emphasis added), including specifically medical experimentation claims. <u>Id.</u> at Annex A, ¶ 4. The Executive Agreement also stated that the "United States shall . . . inform its courts through a Statement of Interest . . . that it would be in the foreign policy interests of the United States for the Foundation to be the exclusive remedy and forum for resolution" of those claims. <u>Id.</u> at Art. 2(1). Specifically, the Executive Agreement provided:

> [T]he United States will timely file a Statement of Interest and accompanying foreign policy statement of the Secretary of State and Declaration of Deputy Treasury Secretary Stuart E. Eizenstat in all pending and future cases, regardless of whether the plaintiff(s) consent(s) to dismissal, in which the United States is notified that a claim has been asserted against German companies arising from the National Socialist era and World War II.

<u>Id.</u> at Annex B, at 1.

On August 12, 2000, after the Joint Statement and

5

Executive Agreement were executed, the German government enacted laws for implementing the Foundation ("Foundation Law"). The Foundation Law allocated DM 50 million for the compensation of "other personal injuries," including injuries to victims of medical experimentation, and capped individual awards for those injuries at DM 15,000. Foundation Law, at §§ 9(1), 9(3). In a series of letters from the lead German negotiator, Otto Graf Lambsdorff, to the lead United States negotiator, Stuart Eizenstat, the German government reaffirmed that the "DM 50 million allocation [for other personal injury] will be distributed to each partner organization so that each approved applicant is provided a pro-rata amount of the total amount of all approved 'other personal injury' applicants" and that the "Foundation will give victims of medical experimentation and Kinderheim cases priority over other non-labor personal injury wrongs." Letter from Lambsdorff to Eizenstat, July 11, 2000. On October 19, 2000, the United States and Germany exchanged diplomatic notes declaring the Foundation Law, as clarified by the Lambsdorrf-Eizenstat letters, to be "fully consistent" with the Executive Agreement, causing the Executive Agreement to enter into force as of that date. Exchange of Notes between the Embassy of the United States and the Federal Foreign Office of Germany, Oct. 19, 2000.

In March 2001, Rozenkier applied for compensation from the Foundation for his injuries. In submitting his application, Rozenkier executed a waiver against "all German companies for claims in connection to National Socialist injustices." The

Foundation approved Rozenkier's application by letter dated February 6, 2004, and issued him two compensation checks for $4,645.09 and $5,348.36.  Decision, 334 F. Supp. 2d at 694.

Notwithstanding his Foundation application, Rozenkier filed suit in the Eastern District of New York against Schering AG and Bayer AG (the "Appellees") on March 25, 2003, alleging that the Appellees had cooperated with the Nazi regime in causing his sterilization, and claiming damages under a number of tort theories, including negligence, infliction of emotional distress, assault and battery, conspiracy, fraud, and breach of the manufacturer's duty to warn, as well as violations of international law.  Rozenkier also alleged that the waiver he had submitted with his Foundation application was void because the Foundation had unilaterally altered the compensation scheme and eliminated the right to file an appeal with the Independent Appeals Authority.   In August 2003, the Judicial Panel on Multidistrict Litigation transferred the action to the United States District Court for the District of New Jersey pursuant to 28 U.S.C. § 1407, on the ground that the case raised common questions of fact with 35 previously transferred Nazi-era cases filed by American plaintiffs against German corporations.

The Appellees moved to dismiss Rozenkier's complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), and the United States filed a statement of interest (the "Statement of Interest") recommending that the action be dismissed.  On September 10, 2004, the district court granted the

7

Appellees' motion, holding that Rozenkier's claims presented a nonjusticiable political question. The court explained that if it were to adjudicate the merits of the complaint, it would be acting against the recommendation of the Executive Branch on an issue of foreign policy. The court thus concluded that Rozenkier's claims were nonjusticiable and that the proper forum for restitution or compensation was the Foundation. In a footnote, the court remarked that it did not need to address Rozenkier's allegations concerning the Foundation's compensation scheme and the right of appeal in detail because those allegations did not involve acts by the Appellants. Finally, the court did not address whether Rozenkier's claim was nonjusticiable on the grounds of the act of state doctrine or international comity.

Rozenkier timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

## II. DISCUSSION

Our review of a dismissal under Federal Rule of Civil Procedure 12(b)(6) on the basis of the political question doctrine is plenary. State of New Jersey v. United States, 91 F.3d 463, 466 (3d Cir. 1996).

On appeal, Rozenkier argues that the political question doctrine does not apply to this case because his claims neither threaten the operation of the Foundation nor implicate the conduct of the United States or the post-war German

8

government. According to Rozenkier, the foreign policy interest of the United States was the creation of the Foundation, and that interest has been fulfilled. Rozenkier also asserts that the German Parliament ("Bundestag") unilaterally altered the compensation calculation for victims of medical experiments to be per capita payments rather than a pro rata distribution; he contends that because the United States did not get what it bargained for in the Executive Agreement, no foreign policy interest exists that would require dismissal of his action.

The Appellees respond that the political question doctrine applies to this case. According to Appellees, adjudicating this case would require United States courts to second-guess 60 years of exclusive intergovernmental resolution of Nazi-era claims, and in particular, the United States foreign policy decision articulated in the Statement of Interest that the Foundation should be the exclusive forum for resolution of the claims of Rozenkier and similarly situated individuals. Appellees also contend that the additional defenses of the act of state doctrine and international comity require dismissal as well.

We agree with the Appellees that the district court correctly dismissed Rozenkier's claims as raising a nonjusticiable political question. The political question doctrine is a judicially created theory that limits the power of the federal courts to adjudicate certain types of claims. The "nonjusticiability of a political question is primarily a function of the separation of powers." Baker v. Carr, 369 U.S. 186, 210 (1962). As the Supreme Court held in the landmark case of

9

Marbury v. Madison, 1 Cranch 137 (1803), certain political issues are left to the executive, whose decisions on those matters are conclusive:

> By the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience. . . . In such cases, their acts are his acts; and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion. The subjects are political. They respect the nation, not individual rights, and being entrusted to the executive, the decision of the executive is conclusive.

Id. at 165-66. Thus, "[w]hen a court concludes that an issue presents a nonjusticiable political question, it declines to address the merits of that issue." U.S. Dept. of Commerce v. Montana, 503 U.S. 442, 457-58 (1992).

In Baker, the Supreme Court in dictum addressed political questions involving foreign relations, noting that judicial scrutiny of foreign relations decisions involves a "discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature

10

and posture in the specific case, and of the possible consequences of judicial action." 369 U.S. at 211-12. While cautioning that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance," the Supreme Court identified six factors, any one of which indicates the presence of a nonjusticiable political question:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Id. at 211, 217. Here, we conclude that Rozenkier's claims present a nonjusticiable political question because the fourth Baker factor is clearly implicated: the adjudication of Nazi-era

11

claims by United States federal courts would express a lack of respect for the Executive Branch because of the Executive Branch's longstanding foreign policy interest that issues relating to World War II and Nazi-era claims be resolved through intergovernmental negotiation.

As the Executive Agreement notes, the United States and German governments worked for 55 years to address the consequences of the National Socialist era and World War II through political and governmental acts between the two governments, and "the Agreement and the establishment of the Foundation represent a fulfillment of these efforts." Executive Agreement, at 4. The first intergovernmental agreement to address Nazi-era wrongdoing by the German government and German companies was the 1945 Potsdam Agreement, in which the United States, Great Britain, and the Soviet Union agreed to remove German industrial assets as war reparations. See American Ins. Ass'n v. Garamendi, 539 U.S. 396, 403 (2003). That policy continued with the Paris Agreement, which provided that the signatory nations would share the seized German assets as settlement of "all [their] claims and those of [their] nationals against the former [German] Government and its Agencies, of a governmental or private nature, arising out of the war." Id. (quoting the Paris Agreement). The effect of the Paris Agreement was curtailed, however, and attention to reparations intentionally deferred, when the western Allies moved to end their occupation and reestablish a sovereign Germany as a buffer against Soviet expansion. Concerned that continued reparations would cripple the new Federal Republic of Germany

12

economically, the Allies decided in the 1953 London Debt Agreement to put off "[c]onsideration of claims arising out of the second World War by countries which were at war with or were occupied by Germany during that war, and by nationals of such countries, against the Reich and agencies of the Reich . . . until the final settlement of the problem of reparation." Id. at 403–04 (quoting the Agreement on German External Debts). Those terms were construed by German courts as postponing the resolution of foreign claims against both the German government and German industry until the terms of an ultimate postwar treaty were resolved. See id. at 405.

In the meantime, the Allies assigned the responsibility of providing restitution to victims of Nazi persecution to the new German government. See id. (citing the Convention of the Settlement of Matters Arising Out of the War and the Occupation, May 26, 1952). Pursuant to this treaty obligation, Germany enacted domestic legislation and entered into a number of bilateral agreements with other nations and non-governmental organizations. See id. By 2000, Germany had paid more than DM 100 billion in compensation to Nazi-era victims. See id. A number of victims, however, have attempted to pursue litigation in United States courts. Those suits generated much protest by the defendant companies and the German government, to the point that the United States government took action to try to resolve "the last great compensation related negotiation arising out of World War II." Garamendi, 539 U.S. at 405 (quoting a press briefing by Deputy Secretary of Treasury Eizenstat). The ensuing negotiations at

13

the intergovernmental level culminated in the creation of the Foundation and the signing of the Executive Agreement. See id.

The history of the Foundation and the Executive Agreement make clear that the Executive and Legislative branches have exclusively managed the resolution of Nazi-era reparations claims for 55 years. The longstanding history of negotiations at the intergovernmental level represents a foreign policy interest that Nazi-era claims be resolved through the political branch. Here, we are mindful of the Supreme Court's emphasis on preserving the "'capacity of the President to speak for the Nation with one voice in dealing with other governments' to resolve claims . . . arising out of World War II." Garamendi, 539 U.S. at 424.

In Garamendi, the Supreme Court discussed the same set of agreements for Holocaust compensation that are at issue here, holding that California's Holocaust Victim Insurance Relief Act (HVIRA), and in particular a provision of the HVIRA requiring any insurer that did business in California and that sold insurance policies in Europe which were in effect during the Holocaust-era to disclose certain information about those policies to the California Insurance Commissioner or risk losing its license, impermissibly interfered with the Executive Branch's foreign policy, and was preempted on that basis. Id., 539 U.S. at 421. The Court observed:

> [R]esolving Holocaust-era insurance claims that may be held by residents of this country is a

14

matter well within the Executive's responsibility for foreign affairs. Since claims remaining in the aftermath of hostilities may be "sources of friction" acting as an "impediment to resumption of friendly relations" between the countries involved, there is a "longstanding practice" of the national Executive to settle them in discharging its responsibility to maintain the Nation's relationships with other countries. The issue of restitution for Nazi crimes has in fact been addressed in Executive Branch diplomacy and formalized in treaties and executive agreements over the last half century, and although resolution of private claims was postponed by the Cold War, securing private interests is an express object of diplomacy today, just as it was addressed in agreements soon after the Second World War. Vindicating victims injured by acts and omissions of enemy corporations in wartime is thus within the traditional subject matter of foreign policy in which national, not state, interests are overriding, and which the National Government has addressed.

Id. at 420-21. Although Garamendi was not a political question case, the same reasoning applies here. The Executive Branch engaged in a decades-long negotiation with the German government to resolve Nazi-era reparations claims. That process culminated with the signing of the Executive

15

Agreement, which enunciated a foreign policy that the Foundation be the exclusive forum for claims by Nazi-era victims of medical experimentation against German companies. The Statement of Interest confirms that understanding. In this context, judicial review of Rozenkier's claims would express a lack of respect for the Executive Branch's longstanding foreign policy interest in resolving Nazi-era claims through intergovernmental negotiation. We therefore conclude that his case presents a nonjusticiable political question that requires dismissal.

We reject Rozenkier's argument that United States foreign policy interests were limited to the act of "creating" the Foundation. As discussed, the Executive Branch has expressed a longstanding foreign policy interest in resolving Nazi-era claims at the intergovernmental level, and that interest did not terminate with the creation of the Foundation. Indeed, the Statement of Interest provides that, four years after the creation of the Foundation, the "United States maintains [the] policy in the current administration" that "all asserted claims should be pursued through the Foundation instead of the courts." Statement of Interest, at 11.

In so holding, we reach the same result as the Second Circuit and New Jersey district courts that have dismissed claims arising out of the Nazi-era on political question grounds. See Whiteman v. Dorotheum GmbH & Co. KG, 431 F.3d 57 (2d Cir. 2005) (affirming the dismissal of Nazi-era claims against Austria on political question grounds); In re Nazi Era Cases

16

Against German Defendants Litig., 129 F. Supp. 2d 370, 383 (D.N.J. 2001) (dismissing on political question and international comity grounds); Burger v. Fischer v. DeGussa AG, 65 F. Supp. 2d 248 (D.N.J. 1999) (dismissing on political question grounds); Iwanowa v. Ford Motor Co., 67 F. Supp. 2d 424 (D.N.J. 1999) (dismissing on political question and international comity grounds).

In Whiteman, the Second Circuit dismissed a putative class action against Austria for Nazi-era wrongdoing as a nonjusticiable political question. 431 F.3d at 59-60. The court held:

> We conclude that we cannot "undertak[e] independent resolution without expressing lack of respect due" the Executive Branch because (1) the Executive Branch has exercised its authority to enter into executive agreements respecting the resolution of the claims in question; (2) the United States Government (a) has established through an executive agreement an alternative international forum for considering the claims in question, and (b) has indicated that, as a matter of foreign policy, the alternative forum is superior to litigation; and (3) the United States foreign policy advanced by the executive agreement is substantially undermined by the continuing pendency of this case.

17

<u>Id.</u> at 73-74 (quoting <u>Baker</u>, 369 U.S. at 217). The Second Circuit's analysis is thus consistent with our holding that the claims of Rozenkier and similarly situated individuals present a nonjusticiable political question. We note, however, that our conclusion rests not only on the foreign policy interests expressed in the Executive Agreement and the Statement of Interest, but also on the United States' long-standing foreign policy commitment to resolving reparations claims arising out of World War II and the Holocaust at the governmental level.

We are aware that the Ninth Circuit has rendered a decision in <u>Alperin v. Vatican Bank</u>, 410 F.3d 532 (9th Cir. 2005), in which it arrived at the same conclusion that we do concerning slave labor claims against the Vatican Bank, but not with regard to property claims against the Vatican Bank. In <u>Alperin</u>, Holocaust survivors asserted property claims alleging that the Vatican Bank had profited from looted assets and slave labor during the Croatian Ustasha political regime, which was supported throughout World War II by Nazi forces. The Holocaust survivors also asserted slave labor claims alleging that the Vatican Bank had actively assisted the war objectives of the Utasha Regime in violation of international law. The Ninth Circuit allowed the property claims to proceed, but noted that the case was "distinguishable from those involving the Foundation in that there is <u>no analogous executive agreement</u> covering claims to the Ustasha treasury." <u>Id.</u> at 550 (emphasis added) (referring to <u>Decision</u>, 334 F. Supp. 2d at 696-97). Thus, <u>Alperin</u> is not persuasive to the resolution of this case involving the Foundation. However, the court held that the slave labor

18

claims were nonjusticiable because they raised a political question. Id. at 562. Thus, the holding of Alperin in its analysis of the slave labor claims is consistent with our resolution here concerning tort claims.

Finally, we respectfully find the Eleventh Circuit's reasoning in Ungaro-Benages v. Dredsner Bank AG, 379 F.3d 1227 (11th Cir. 2004), to be unpersuasive. In that case, the Eleventh Circuit declined to dismiss a Holocaust-related claim against German banks based on the political doctrine, instead dismissing the claim on the grounds of international comity. 379 F.3d at 1236, 1239. The court reasoned that because the Executive Agreement, which is the same as that at issue here, stated that it did not provide an independent legal basis for dismissal, the "President has purposely chosen not to settle [the] claims directly" and therefore adjudication of the claims does not "interfere with American foreign relations." Id. at 1237, 1236.

We disagree with the Eleventh Circuit's interpretation of the Executive Agreement. The provision in the Executive Agreement that the court relied on for its holding that the political question doctrine was inapplicable is set forth in the section entitled "Elements of U.S. Government Statement of Interest," and provides: "The United States does not suggest that its policy interests concerning the Foundation in themselves provide an independent legal basis for dismissal, but will reinforce the point that U.S. policy interests favor dismissal on any valid legal ground." Executive Agreement, Annex B, ¶ 7.

19

However, that language does not preclude United States federal courts from dismissing claims arising under the Executive Agreement as raising a nonjusticiable political question. Indeed, in its Statement of Interest in this case, the United States recommends dismissal based on foreign policy interests. Thus, while the United States has not asserted that the foreign policy interests expressed in the Executive Agreement and the Statement of Interest[1] provide an independent legal basis for

---

1      The Executive Agreement states that "it would be in the foreign policy interests of
the United States to be the exclusive remedy and forum for resolving . . . claims asserted against German companies . . . and that dismissal of such cases would be in its foreign policy interest." Executive Agreement, Art. 2(1). The Executive Agreement also explains that the foreign policy interest at issue was resolving Nazi-era cases outside of litigation and creating an all-embracing and enduring peace. Executive Agreement, at 3. Further, the Statement of Interest asserts that

> [t]he President of the United States concluded that it would be in the foreign policy interests of the United States for the Foundation to be the exclusive forum and remedy for the resolution of all asserted claims against German companies arising from their involvement in the Nazi era and World War II, including without limitation those relating to compensation for slave and forced labor, "aryanization" or other confiscation of, damage to, or loss of property (including banking assets and insurance policies), subjection to medical experimentation, placement in children's homes, and other cases of

20

dismissal, such interests are especially compelling here, and the United States government's long-standing foreign policy commitment to resolving reparations claims arising out of World War II and the Holocaust at the governmental level, coupled with the more recent creation of the Foundation, the signing of the Executive Agreement, and the filing of the Statement of Interest in this case, together provide such a basis.

Because we conclude that the claims of Rozenkier and similarly situated individuals present a nonjusticiable political question, we do not address whether the act of state doctrine and international comity are alternative grounds for dismissal. In addition, we have considered Rozenkier's remaining arguments and find them unpersuasive or unnecessary for our decision. Because Rozenkier's claims present a nonjusticiable political question, we affirm the district court's judgment granting the Appellees' motion to dismiss Rozenkier's complaint.

## III. CONCLUSION

For the foregoing reasons, we affirm the decision of the district court.

---

personal injury.

Statement of Interest, at 11 (citing Letter of President Clinton to Chancellor Schroeder, Dec. 13, 1999).

21